COMMONWEALTH *vs.* DAVID ALVAREZ
(and seventeen companion cases[1]).

Hampden. September 12, 1995. - February 28, 1996.

Present: LIACOS, C.J., WILKINS, LYNCH, & O'CONNOR, JJ.


*Probable Cause. Search and Seizure,* Probable cause, Warrant, Affidavit.
   *Constitutional Law,* Probable cause, Search and seizure. *Practice, Crimi-*
   *nal,* Assistance of counsel. *Joint Enterprise. Controlled Substances. Due*
   *Process of Law,* Transcript of trial.


Statements made by a juvenile under arrest for cocaine trafficking, based on
   his recent first hand observations and against his penal interest, indicat-
   ing his knowledge of and participation in a large-scale narcotics opera-
   tion were sufficient to establish his veracity and the basis of his knowl-
   edge was not shown to be stale: an affidavit in support of a search
   warrant application containing the statements of the named juvenile
   provided probable cause for the issuance of the warrant. [203-205]
In the circumstances of the execution of a valid search warrant, police of-
   ficers could properly conclude, based on information received during the
   search that the drugs they were looking for had been moved to another
   apartment in the building, that several keys on a ring, relevant to the is-
   sue of control over the premises, could be an instrumentality of crime
   and within the scope of the search warrant. [206]
An anonymous but specific, timely, and detailed tip that drugs had been
   moved to a certain apartment, corroborated by police officers' lawful
   observations under the authority of a valid search warrant, including the
   fact that the defendant had a key to that apartment, as stated in an affi-
   davit was sufficient to establish probable cause for the issuance of a
   search warrant for that apartment. [206-208]
A misstatement in an affidavit in support of a search warrant was not
   shown to be made recklessly, knowingly or intentionally. [208]
Police officers did not violate any constitutional rights of certain defendants
   by inserting into an apartment lock a key that had properly been seized
   under a search warrant where the expectation of privacy in the lock
   mechanism located in a common hallway was minimal, and where the
   police had a reasonable suspicion to insert the key: information that the
   key fit the lock was properly included in an affidavit in support of a
   search warrant. [208-210]

---

[1]Two indictments against Miguel A. Ocasio, two indictments against
Marc Ferrait, two indictments against John Barreto, five indictments
against Jeanatte Pizzaro, five indictments against Pedro Ramos, and one
indictment against David Alvarez.

Police officers' observations, made during a warrantless "walk through" of an apartment to secure the premises while obtaining a search warrant, were not used to obtain the search warrant and thus did not taint the warrant subsequently received. [210-211]

A criminal defendant's claims that her trial counsel was ineffective for failing to object to admissible evidence were without merit. [211]

At the trial of indictments for trafficking in cocaine that were submitted to the jury on a joint venture theory, sufficient evidence supported the jury's verdict of guilty. [211-212]

A twenty-seven month delay in the production of transcripts of a criminal trial for use on appeal, although attributable to the Commonwealth, was not shown to be deliberate or to have prejudiced the defendant and was not a violation of the defendant's due process rights under the Federal and State Constitutions. [212-213]

INDICTMENTS found and returned in the Superior Court Department on August 27, 1991.

Pretrial motions to suppress evidence were heard by *Constance M. Sweeney,* J., and the cases were tried before *John F. Murphy, Jr.,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Roger A. Cox* (*Deidre Lee Thurber, Paul F. Murphy, Richard Passalacqua & Timothy M. Farris* with him) for David Alvarez & others.

*Eric S. Brandt,* Committee for Public Counsel Services, for Mark Ferrait.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

LYNCH, J. All six defendants were convicted of cocaine trafficking in violation of G. L. c. 94C, § 32E (*b*) (1994 ed.), and possession of cocaine with intent to distribute in violation of G. L. c. 94C, § 32A (1994 ed.);[2] all filed timely notices of appeal. They assert, inter alia, that a judge in the Superior Court erred in denying their motions to suppress evidence seized during the execution of a search warrant, arguing that the warrant was not supported by probable cause.[3] We granted the defendants' application for direct appellate review and now affirm.

[2]Ramos and Pizzaro were also convicted on three counts of unlawful possession of a firearm in violation of G. L. c. 269, § 10 (*h*) (1994 ed.).

[3]One or more of the defendants makes the following arguments: (1) the search warrant for 828 Hampden Street in Holyoke was not supported by probable cause; (2) a key seized in the search of 828 Hampden Street

We summarize the facts as follows: On August 15, 1991, Lieutenant Alan G. Fletcher of the Holyoke police department applied for a no-knock warrant to search the second floor, right-side apartment at 828 Hampden Street in Holyoke. Captain Richard Page had applied for a search warrant for the third floor, left-side apartment at 487 Pleasant Street in Holyoke. The information in the affidavits in support of these applications was obtained from a fifteen year old juvenile (juvenile), and Marilyn Reyes. Both the juvenile and Reyes had been arrested the day before for cocaine trafficking.

During police questioning, the juvenile and Reyes stated that they had been "dealing drugs" for David Soto, who lived at the 487 Pleasant Street address. According to the search warrant affidavit, the juvenile informed the police that Ramos, whom he identified as "Pete," was "the big dealer." He stated that Pete lived on the second floor, right-side apartment, at 828 Hampden Street, which was rented by Pizzaro. The juvenile stated that he had received crack cocaine at 828 Hampden Street about one and one-half weeks earlier. He stated that he had also bought crack cocaine from the same apartment on two other occasions. Furthermore, when arrested, the juvenile was in possession of 648 vials of crack cocaine, which he told police came from the 828 Hampden Street apartment.

The juvenile said that cocaine from 828 Hampden Street was packaged in plastic vials with black caps wrapped in tape. He also informed the police that Ramos and Soto had recently engaged in a gun battle involving semi-automatic weapons in Chicopee.[4] Based on the above information, Lt. Fletcher requested a no-knock warrant for 828 Hampden Street. The search warrants for both addresses issued at approximately 10:30 A.M. on August 15, 1991.

Both 828 Hampden Street and 487 Pleasant Street are in fact part of the same large, four-story, L-shaped building.

---

exceeded the scope of the search warrant; (3) the search warrant for 475 Pleasant Street in Holyoke was not supported by probable cause (and various subissues); (4) Pizzaro argues that her right to effective assistance of counsel was violated; (5) Ferrait argues that the jury could have improperly found him guilty on a theory of individual liability; and (6) Ramos argues that a delay in producing transcripts violated his due process rights.

[4]Lieutenant Fletcher did not include the information about the gun battle in the search warrant affidavit.

Hampden Street and Pleasant Street intersect, and the building is on the corner. Also part of this L-shaped building are 475, 477, 479, 481, 483, 485, and 489 Pleasant Street. There is a back porch on each floor which runs the entire length of the building and connects all of the apartments on that floor.

After arriving at the search locations, Lt. Fletcher received a radio dispatch from Officer Brian Kelly at police headquarters, asking to see Lt. Fletcher immediately. Lt. Fletcher then returned to headquarters and Officer Kelly informed him that, shortly after 10:30 A.M., an anonymous female informant, speaking in a somewhat garbled, quiet voice, called to report that the drugs had been moved to the second floor, right-side apartment, at 475 Pleasant Street. This apartment was about thirty feet from 828 Hampden Street via the back porch.

While receiving this call, Officer Kelly was also juggling multiple radio channels and emergency calls. Although the caller referred to her "son," Officer Kelly's impression was that the informant was relaying first-hand information. The informant called again and told Officer Kelly: "Make sure you don't get in the wrong apartment," and confirmed twice that the address was 475 Pleasant Street, second floor, right side.

On receiving this information, Lt. Fletcher contacted a State trooper at the raid site and told him that the drugs had been moved to the Pleasant Street apartment. During the telephone call to the raid site, Lt. Fletcher shouted questions at Officer Kelly to verify information. Officer Kelly answered Lt. Fletcher's questions while trying to respond to other telephone calls. Based on these answers, Lt. Fletcher informed the State trooper that an informant had seen the drugs being moved just before the search parties arrived. Lt. Fletcher then instructed the State trooper to have the Pleasant Street apartment secured pending his arrival.

Meanwhile, the search of the Hampden Street apartment had been proceeding. Only six vials of cocaine were found there. Based on the juvenile's information, Lt. Fletcher had expected to find more cocaine. The search did reveal indicia of a large-scale drug operation, including four "beepers," several pagers, and a ledger indicating an approximately $30,000 a week drug business. Also found during the search was a cable television bill addressed to Rebecca Martinez at 475 Pleasant Street.

During the search of 828 Hampden Street, police arrested the six defendants. Four of them were found in the living room. Ramos and Pizzaro were found in a back bedroom. On the table next to the bed was a key ring with several keys.

While police searched the apartment, Officer Hercules Robinson overheard one male defendant remark to another in Spanish: "What do they think, I'm crazy to keep the stuff here?" Officer Robinson told the other officers about the statement, attributing it to Ramos. This information was relayed to Lt. Fletcher.

Lieutenant Fletcher thereafter ordered members of the raid team to try the keys found in the Hampden Street apartment on certain nearby automobiles, and on the lock of the 475 Pleasant Street apartment. One of the keys from Ramos's bedroom opened the door to an automobile that the police had observed Ramos driving one week earlier. Another of the keys fit the lock to the front door of the 475 Pleasant Street apartment.

The police unlocked and opened the door of the 475 Pleasant Street apartment with one of the keys they had found. On gaining entry, the officers searched the apartment to see whether anyone was inside. Finding no one, the police locked the door again and secured the front and back entrances.

Lieutenant Fletcher returned to police headquarters and prepared a search warrant application for the 475 Pleasant Street apartment. While preparing the affidavit, Lt. Fletcher attempted to verify second-hand information. He asked Officer Robinson twice for the identity of the defendant who had stated that he did not keep the "stuff" in 828 Hampden Street. Both times, Officer Robinson said that it was Ramos.

The affidavit related that an anonymous female informant reported "that the drugs we were looking for were in the next door apartment at 475 Pleasant street, second floor right side . . . [and] that the drugs we were looking for were moved to this apartment . . . within ten minutes of our arrival."

The affidavit also contained the statement attributed to Ramos: "What do they think, I'm stupid to keep drugs inside this apartment." Lt. Fletcher included the juvenile's information in the affidavit, as well as the fact that police discovered signs of a large-scale drug operation at the Hampden Street apartment, but only found six vials of crack cocaine, which were in plastic vials with black caps. The affidavit also

mentioned that a key from a key ring found at 828 Hampden Street and containing Ramos's automobile key opened the door of 475 Pleasant Street.

A search warrant for the 475 Pleasant Street apartment was issued at approximately 1:30 P.M. by the same magistrate who issued the warrants for the other apartments. When the police searched 475 Pleasant Street, they discovered the following in a padlocked closet in a bedroom: 4,108 vials of crack cocaine; $6,557 in cash; a sawed-off shotgun; eight other firearms; a hamper full of ammunition; a 200-gram scale; handcuffs; and a large quantity of drug packaging material, including empty vials and black caps.

At trial, David Soto testified as the Commonwealth's witness. He described a drug distribution operation in which Ramos was the leader and Soto was the second in command. According to Soto, Pizzaro was Ramos's girl friend and sometimes made trips to New York to pick up shipments of cocaine.

The Commonwealth introduced in evidence, without objection, the personal diary of Pizzaro. The diary contained entries about her trips to New York. The Commonwealth also introduced, without objection, testimony of a police officer who had searched a safe deposit box rented by Pizzaro.

1. *Probable cause for issuance of a warrant to search 828 Hampden Street.* Pizzaro alone argues that there was insufficient probable cause for the issuance of a warrant to search 828 Hampden Street. In evaluating a search warrant based on information provided by an anonymous informant, we follow the two-pronged test set out in *Spinelli* v. *United States,* 393 U.S. 410, 415 (1969), and *Aguilar* v. *Texas,* 378 U.S. 108, 114 (1964). See *Commonwealth* v. *Welch,* 420 Mass. 646, 650 (1995); *Commonwealth* v. *Upton,* 394 Mass. 363, 374-375 (1985). We require that such an affidavit "must provide the magistrate with facts showing some of the underlying circumstances leading to the informant's knowledge, as well as his reliability. . . . If the informant's tip fails to satisfy one of these portions of the *Aguilar* test, other independent, corroborating allegations in the affidavit may supplement the informant's tip to support a finding of probable cause. . . . Nevertheless, '[e]ach prong of the *Aguilar-Spinelli* test — the basis of knowledge and the veracity of the informant — presents an independently important consideration.' *Com-*

monwealth v. *Upton, supra* at 375-376." (Citations omitted.) *Commonwealth* v. *Reddington,* 395 Mass. 315, 322 (1985).

Pizzaro argues that the statements by the juvenile did not satisfy the veracity prong because the statement about Ramos was not against the juvenile's penal interest and did not satisfy the basis of knowledge prong because the information about the activities at 828 Hampden Street was stale. We agree with the motion judge that there was probable cause for the warrant to issue.[5]

The veracity prong has been met where, as here, there is a statement against penal interest made by an identified informant. "We have relaxed the requirement of known reliability . . . for a named and identified informant." *Commonwealth* v. *Burt,* 393 Mass. 703, 710 (1985), citing *Commonwealth* v. *Atchue,* 393 Mass. 343, 347-348 (1984). In addition: "In order for a statement to be considered by the magistrate to be a statement against penal interest, there must be information in the affidavit which tends to show that the informant would have had a reasonable fear of prosecution at the time that he made the statement." *Commonwealth* v. *Melendez,* 407 Mass. 53, 56 (1990).

Pizzaro concedes that the juvenile had a reasonable fear of prosecution for his statements regarding David Soto, but argues that he had no such fear for statements regarding Ramos. We refuse to subject the affidavit to such a "hypercritical analysis." *Commonwealth* v. *Blake,* 413 Mass. 823, 827 (1992). According to the affidavit, the juvenile stated that the vials of crack cocaine confiscated in the apartment where he was arrested belonged to Soto. But he also stated that the "big dealer" was named Pete, that Pete lived at 828 Hampden Street, second-floor apartment, right side, and that the cocaine in his possession came from the Hampden Street apartment. The juvenile also told police that he was inside the Hampden Street apartment on at least three occasions and that he had received crack cocaine on those occasions. The juvenile could have reasonably feared that his statements regarding Soto and Ramos and the drug activities at 828 Hampden Street could lead to his prosecution on drug

[5]"The judge's findings of fact are binding in the absence of clear error, and we view, with particular respect, the conclusions of law which are based on them." *Commonwealth* v. *Welch,* 420 Mass. 646, 651 (1995), and cases cited.

charges. Therefore, the statements were against the juvenile's penal interest and, together with his inherent reliability as a named informant, establish the veracity prong of the *Aguilar-Spinelli* test. See *Commonwealth* v. *Parapar*, 404 Mass. 319, 322-324 (1989).

The information the juvenile gave to police was based on his direct observations of drug activities at 828 Hampden Street. "First-hand receipt of information through personal observation satisfies the basis of knowledge prong of *Aguilar-Spinelli*." *Commonwealth* v. *Allen*, 406 Mass. 575, 578 (1990). Pizzaro argues, however, that the information from the juvenile was stale and therefore insufficient to establish his basis of knowledge. See *Commonwealth* v. *Reddington*, *supra* at 323-324 (January tip insufficient to establish probable cause in August). We disagree.

"[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Commonwealth* v. *Burt*, *supra* at 716, quoting *Commonwealth* v. *Vynorious*, 369 Mass. 17, 25 (1975). See *Commonwealth* v. *Reddington*, *supra* at 323. Here, the affidavit recited a series of observed drug transactions at the 828 Hampden Street apartment, including a transaction one and one-half weeks before the juvenile's arrest. In addition, on the day of his arrest — which was the day before the search warrant issued — the juvenile was arrested in possession of 648 vials of crack cocaine. He told police that the crack vials came from the same Hampden Street address where Pete, the "big dealer," lived, and where the juvenile had previously participated in drug transactions. Such information is indicative of the kinds of activities "inherent in a large-scale narcotics operation" that is ongoing and continuous. *Commonwealth* v. *Reddington*, *supra* at 323, quoting *United States* v. *Harris*, 482 F.2d 1115, 1119 (3d Cir. 1973). Thus, the recent observations of the juvenile and the evidence of large-scale operations provided probable cause to believe that evidence of criminal activity was located at the Hampden Street apartment at the time the search warrant was obtained. *Id.* Accordingly, we find no error in the judge's decision that there was probable cause for the warrant to issue to search 828 Hampden Street.

2. *Scope of 828 Hampden Street search warrant.* Ramos alone argues that seizing the key to the apartment at 475 Pleasant Street was outside the scope of the search warrant and therefore illegal. We disagree.

"The Fourth Amendment to the United States Constitution requires that warrants 'particularly describ[e] the place to be searched, and the persons or things to be seized.' Article 14 of the Massachusetts Declaration of Rights requires warrants to be 'accompanied with a special designation of the persons or objects of search, arrest, or seizure.' General Laws c. 276, § 2, provides that search warrants 'shall particularly describe the property or articles to be searched for.' " *Commonwealth* v. *Freiberg*, 405 Mass. 282, 298, cert. denied, 493 U.S. 940 (1989). Evidence inadvertently found in "plain view" may be seized during the course of a search pursuant to a warrant if the police recognize it to be plausibly related as proof of criminal activity of which they were already aware. See *Commonwealth* v. *Cefalo*, 381 Mass. 319, 330-331 (1980); *Commonwealth* v. *Accaputo*, 380 Mass. 435, 447-448 (1980). See also *Commonwealth* v. *LaPlante*, 416 Mass. 433, 439-440 (1993). In addition, it is proper for police to seize evidence relevant to establishing the defendant's connection with and control over the premises. See *Commonwealth* v. *Young*, 382 Mass. 448, 458 (1981).

The key to 475 Pleasant Street was one of several keys on a ring that was found in plain view in the bedroom of the 828 Hampden Street apartment. There was no reason for police to have anticipated the presence of the keys, but once they were observed, the police had a reasonable basis to conclude that they were relevant to the issue of control over the premises. In addition, as information began to emerge during the execution of the search warrant that the drugs may have been moved, it was reasonable for the police to conclude that one of the keys might be to a nearby apartment and thus an "instrumentality of crime" and within the scope of the warrant. Accordingly, we conclude that the seizure of the key was proper. *Commonwealth* v. *Cefalo, supra* at 327-328.

3. *Probable cause for issuance of a warrant to search 475 Pleasant Street.* All six defendants argue that the search warrant for the apartment at 475 Pleasant Street was not supported by probable cause and so, they argue, the considerable evidence obtained as a result of that search should be sup-

pressed. We conclude that there was probable cause and affirm the judge's denial of the motion to suppress.

We first note that "[t]he sufficiency of an affidavit is to be decided on the basis of a consideration of all of its allegations as a whole, and not by first dissecting it and then subjecting each resulting fragment to a hypertechnical test of its sufficiency standing alone." *Commonwealth* v. *Burt, supra* at 715, quoting *Commonwealth* v. *Stewart,* 358 Mass. 747, 751 (1971). Here, the search warrant was based on: (1) the information from the juvenile; (2) the results of the 828 Hampden Street search, including indicia of a large drug operation but few drugs; (3) the overheard statement of Ramos that he did not keep the drugs in that apartment;[6] (4) the anonymous tip; (5) the fact that a key from Ramos's key ring opened the door at 475 Pleasant Street; and (6) the fact that the apartments were connected by a back porch. No information obtained from the first, walk-through, search of the 475 Pleasant Street apartment was used in obtaining the search warrant.

Because the affidavit was based in part on the tip of an unidentified informant, we first determine whether it meets the veracity and basis of knowledge prongs of the *Aguilar-Spinelli* test or, if deficient, whether independent corroboration compensates for the deficiencies.[7]

We agree with the motion judge that the anonymous tip, as reported in the affidavit, satisfied both prongs of the test. The promptness of the information, the specificity of the observations, and the particularity of the detail as to location permitted the inference that the informant saw the drugs at the precise place stated or saw them being carried into the Pleasant Street apartment. This satisfies the basis of knowledge prong. See *Commonwealth* v. *Atchue,* 393 Mass. 343, 348 (1984). The veracity prong was similarly satisfied where the

---

[6]The trial judge allowed Ramos's motion to suppress the statement because it was given without Miranda warnings. We therefore contemplate whether "the affidavit, considered without the tainted evidence, is sufficient to establish probable cause." *Commonwealth* v. *White,* 374 Mass. 132, 139 (1977), aff'd by an equally divided Court, 439 U.S. 280 (1978). See *Commonwealth* v. *Hall,* 366 Mass. 790, 795 (1975).

[7]The Commonwealth argues that, where an anonymous tip is just one of several bases for a warrant, the test set out in *Spinelli* v. *United States,* 393 U.S. 410, 415 (1969), and *Aguilar* v. *Texas,* 378 U.S. 108, 114 (1964), does not apply. We do not reach this argument, since we find that the tip, as corroborated, met both prongs of the test.

police corroborated significant details of the tip, in particular the fact that Ramos had a key and thus access to the 475 Pleasant Street apartment. See *Commonwealth* v. *Germain,* 396 Mass. 413, 418 (1985).

Moreover, even if the tip alone was insufficient to establish probable cause, it was sufficiently corroborated by the police investigation and additional information. The cumulative information in the affidavit provided probable cause to believe that the bulk of the drugs the police were searching for had been moved and were being stored at 475 Pleasant Street. Therefore, a search warrant properly issued based on the information contained in the affidavit. See *Commonwealth* v. *Welch,* 420 Mass. 646, 653 (1995).

John Barreto argues that the affidavit was invalid because it contained misstatements of fact regarding the informant's tip which were made knowingly and intentionally or with reckless disregard for their truth. See *Franks* v. *Delaware,* 438 U.S. 154, 155-156 (1978). We agree that the statement that the drugs had been moved "within ten minutes of our arrival" was incorrect, but we disagree that the police officers involved acted recklessly, knowingly, or intentionally in making it. The officers involved in the three-way communication — the dispatcher, Officer Kelly, to Lt. Fletcher in a noisy, busy police station; and Lt. Fletcher to the State trooper at the raid site — attempted diligently to verify the tip, including its recency, under extreme time pressure. We agree with the motion judge that this behavior was "a far cry from recklessness."[8] See *Commonwealth* v. *Blake,* 413 Mass. 823, 825-826 (1992).

The defendants argue that inserting the key into the lock at 475 Pleasant Street constituted a warrantless search and that, since the information that the key fit the lock formed part of the basis for the warrant to search the apartment, any evidence obtained as a result of that search should be suppressed. We agree that a search occurred when the police used the key to open the lock and enter the apartment. However, the evidence found in the locked closet at 475 Pleasant Street need not be suppressed.

---

[8]Barreto also argues that Officer Kelly misrepresented the anonymous tip as made by someone with personal knowledge of the facts. On the contrary, we agree with the motion judge that, in the circumstances, Officer Kelly was not reckless in inferring that the informant had personally observed the drugs being moved.

To analyze the situation properly, we must distinguish between two separate acts: First, inserting the key into the lock and turning it to see whether it fit, and second, opening the door and conducting the walk-through search of the apartment. We will address the propriety of these two actions in turn.[9]

The Federal and State Constitutions do not prohibit all searches — only those searches that are unreasonable. Determining whether a "search in the constitutional sense" has taken place "turns on whether the police conduct has intruded on a constitutionally protected reasonable expectation of privacy." *Commonwealth* v. *Welch, supra* at 653, quoting *Commonwealth* v. *Montanez,* 410 Mass. 290, 301 (1991).

For the purposes of this discussion we assume that a search occurred when the police inserted the key into the lock. See *United States* v. *Concepcion,* 942 F.2d 1170, 1173 (7th Cir. 1991). See also *Arizona* v. *Hicks,* 480 U.S. 321, 325 (1986). See generally 1 W.R. LaFave, Search and Seizure § 2.3 (b), at 390 (2d ed. 1987 & 1994 Supp.), and cases cited.

We conclude, however, that using a key to conduct a warrantless search of a lock tumbler did not violate the defendants' constitutional rights. "Although the owner of a lock has a privacy interest in a keyhole — enough to make inspection of that lock a 'search' — the privacy interest is so small that the officers do not need probable cause to inspect it." *United States* v. *Concepcion, supra.* In reaching this conclusion the court in *Concepcion* noted that: (1) it was highly unlikely that the defendant was hiding any contraband material in the keyhole; (2) the keyhole was accessible from a common area; and (3) there were numerous other ways for the police to determine whether the defendant had access to the apartment which would not involve searches.[10] *Id.* at 1172-1173.

Other courts that have considered the question have found that inserting a key into an apartment lock did not require

---

[9] The Commonwealth asserts that Ramos waived these issues because they were not briefed by him. By notice to this court, Ramos purported to adopt the arguments in Alvarez's brief regarding these issues. Because we conclude that there was probable cause for the search warrant to issue, we do not reach the waiver issue.

[10] These methods included watching the apartment from a common area, following the defendant, and asking the landlord.

probable cause. See *United States* v. *Lyons,* 898 F.2d 210, 212 (1st Cir.), cert. denied, 498 U.S. 920 (1990); *People* v. *Carroll,* 12 Ill. App. 3d 869, 876 (1973), cert. denied, 417 U.S. 972 (1974); *Cole* v. *State,* 858 S.W.2d 915, 917 (Tenn. Crim. App. 1993).

Applying these principles to the case before us, we conclude that the police did not violate any constitutional rights of the defendants by inserting a key into the lock at 475 Pleasant Street and turning it to see whether it fit. Given the nature of the lock mechanism, which was accessible from a common hallway, any expectation of privacy in the contents of the lock tumbler was minimal.

We therefore conclude that, for such an unobtrusive search, the police needed only a founded or reasonable suspicion to insert the key. Such suspicion arose from the information that: A key from the key ring fit a lock of an automobile that belonged to Ramos; the two apartments were connected by a back porch; and an anonymous caller had stated that the drugs had been moved to 475 Pleasant Street. Accordingly, the warrantless insertion of the key into the lock at 475 Pleasant Street did not violate the right of the defendants to be free from unreasonable searches under the Federal and State Constitutions. Consequently, including the information that the key fit the lock in the search warrant affidavit was not unlawful.

While the subsequent walk-through search of the apartment to "check for bodies" may have intruded on the defendants' rights, it does not justify suppression of evidence discovered after the search warrant was obtained. First, the officers clearly had a right to secure the apartment until a warrant could be obtained. "Securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of the dwelling or its contents." *Commonwealth* v. *Blake, supra* at 829. See *Commonwealth* v. *Navarro,* 39 Mass. App. Ct. 161, 164 (1995). While this might have been accomplished by merely securing the perimeter of the apartment, it was reasonable for the officer to enter the apartment to determine whether it was occupied, to prevent the destruction of evidence, and to protect the safety of the officers and residents of the apartment building. It is also important to note that no information obtained in this search

was used to obtain the subsequent search warrant. Thus the warrant was not tainted by the warrantless search of the apartment. Accordingly, we affirm the judge's denial of the motions to suppress.

4. *Ineffective assistance of counsel.* Pizzaro alone contends that she was denied effective assistance of trial counsel in violation of her State and Federal constitutional rights.[11] Her argument concerns two issues: her trial counsel's failure to object to the admission of her personal diary; and his failure to object to the testimony of a police officer concerning the contents of her safe deposit box. Both these claims border on the frivolous.

The contents of the diary were admissions of the defendant, which, tied in with other evidence, tended to show that the purpose of the trips to New York was to purchase cocaine. The defendant advances no plausible theory on which this evidence was not admissible.

Pizzaro's arguments based on counsel's failure to object to testimony concerning the safe deposit box are similarly deficient. Even if we assume that further authentication of the bank records was required, there is no showing of ineffective assistance of counsel. The prosecutor told the judge that he probably could produce the keeper of the bank records to authenticate that the box was registered to the defendant. There is no suggestion that this was not the case or that forcing the Commonwealth to bring the witness from New York would have "accomplished something material for the defense." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). We conclude that Pizzaro was not denied effective assistance of counsel at her criminal trial.

5. *Joint venture theory.* Marc Ferrait argues that his cocaine trafficking conviction should be reversed because the jury returned a general verdict and thus could have found that he was guilty on either of two theories: individual liability or joint venture. Since there was insufficient evidence to convict him on the individual liability theory, Ferrait argues, his conviction is legally unsupportable.[12] See *Commonwealth* v. *Flynn*, 420 Mass. 810, 818 (1995). Ferrait concedes that there

---

[11]Pizzaro is represented by new counsel on appeal.

[12]Since we conclude that the case was submitted to the jury solely on the joint venture theory, we assume without deciding that there was insufficient evidence to convict Ferrait on the individual liability theory.

was sufficient evidence to permit a finding of joint venture liability on the cocaine trafficking charge.

Here it is clear that the jury based their general verdict on the joint venture theory only. Both the Commonwealth, in its closing argument, and the judge, in his charge, made clear to the jury that Ferrait and the other defendants were being prosecuted on a joint venture theory. Cf. *Commonwealth* v. *Flynn, supra* at 810.[13]

At no point in his discussion of the elements of the crime does the judge mention individual liability. Instead, after charging the jury on joint liability, the judge explicitly linked the joint venture theory to the elements of the underlying crime he had discussed earlier in the charge: "Your analysis of the indictments against the defendants must be made separately, and one by one, and you must consider each of the elements of the crime as I have defined them for you. You must measure them against the standard of a joint enterprise as discussed with you." There was no error.[14]

6. *Due process violation for delay of transcript.* Finally, Ramos argues that a twenty-seven month delay in production of the trial transcripts violated his due process rights under the Federal and State Constitutions and therefore that the charges should be dismissed and the convictions reversed.[15] We disagree.

"[T]o implicate his due process rights, the defendant must

---

[13]In his charge, the judge stated, in part: "Now with regard to the charge of trafficking in cocaine and possession of cocaine with intent to distribute, as has been mentioned to you by the lawyers, the Commonwealth is alleging that all of the defendants were engaged in a joint enterprise or joint venture in the commission of these crimes."

[14]Ferrait argues that, by denying his motion for a required finding of not guilty at the close of the Commonwealth's case, the judge left open the individual liability theory. On the contrary, Ferrait's motion does not specify any theory of liability and asks for findings on both indictments. See *Commonwealth* v. *Fickett*, 403 Mass. 194, 197 (1988). Assuming that the judge should have allowed the motion to the extent that it sought a required finding of not guilty on a theory of individual liability, any error was cured because the case was not submitted to the jury on that theory.

[15]On March 3, 1992, Ramos submitted a request for the trial transcripts. About one and one-half years later, his appellate counsel began making inquiries about the status of those transcripts. After little success with these inquiries, Ramos filed a motion for suspension of sentence on October 18, 1993, based on the delay in transcript production. The motion was denied and the transcripts were produced in May, 1994.

show that the Commonwealth deliberately blocked his appellate rights or that he was significantly prejudiced by the delay." *Campiti* v. *Commonwealth*, 417 Mass. 454, 456 (1994), citing *Commonwealth* v. *Hudson*, 404 Mass. 282, 284-285 (1989). Ramos concedes that "there does not appear to be any deliberate blocking of [his] appellate rights by the Commonwealth or the clerk's office." Moreover, Ramos has shown no prejudice as a result of the delay. In particular, he has not shown that his "ability to present . . . arguments on appeal [has been] adversely affected by the passage of time." *Commonwealth* v. *Hudson, supra* at 285, quoting *Commonwealth* v. *Weichel*, 403 Mass. 103, 109 (1988). In addition, while the delay in producing the transcripts is clearly attributable to the Commonwealth in this case and not to the defendant, that fact by itself does not require reversal. See *Campiti* v. *Commonwealth, supra* at 457. Accordingly, we affirm the convictions.

*So ordered.*