**UNITED STATES of America,**

v.

**Earl DESSESAURE, Defendant.**

**No. CRIM.03–10191–NG.**

United States District Court, D. Massachusetts.

July 2, 2004.

Robert E. Richardson, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

Steven L. Winniman, Winniman & Winniman, Springfield, MA, for Earl Dessesaure (1), Defendant.

## MEMORANDUM AND ORDER RE: MOTION TO RECONSIDER

GERTNER, District Judge.

## I. INTRODUCTION

The government (Assistant United States Attorney Robert E. Richardson) filed a motion to reconsider [document #35] this Court's Memorandum and Or-

der granting in part and denying in part the defendant's motion to suppress evidence [document #31]. That motion is **DENIED.** The purpose of this memorandum is to address some of the issues raised by the government, but perhaps more importantly, to address the troubling tone of the government's submissions.[1]

The core of the government's most recent submission is that the Court's decision was "based in significant respects on an erroneous summary of the facts." The government further notes "neither the Court nor the government has the advantage of the completed record." True enough. There was no completed record, however, the Court's findings were based on the court reporter's unofficial transcript (known as a "dirty ASCII" transcript) supplemented with annotations.[2] Indeed, the government goes on to say that the "government has ordered the hearing transcript," which presumably is also true.

But then the government represents that its recitation in the motion to reconsider is "based on its *best memory of the testimony.*"[3]

The latter statement is, at best, a misrepresentation. The government had more than its own memory of the testimony. Like the Court, the government had the same unofficial transcript from the court reporter, Harry Hagopian, albeit one which is not to be quoted directly because it is not the official version. In short, the government had precisely the same "unofficial" information as the Court and deliberately did not acknowledge it.[4]

---

1. A full recitation of the Court's decision and its legal and factual underpinnings may be found at *United States v. Dessesaure,* 314 F.Supp.2d 81 (D.Mass.2004).

2. Indeed, as I indicated in open court, my software enables me to receive the unofficial transcript in real time and annotate it. My findings are based on those notes.

3. The government reiterates throughout its submission that its Motion to Reconsider is solely based on the government's recollection, or memory of the testimony.

4. The significance of AUSA Richardson's misstatement is not that he was not entitled to obtain the unofficial transcript as he did, but

The government must therefore have been aware, when filing its motion to reconsider, that the Court's summary of the testimony was entirely accurate. The government's argument cannot be that witnesses were misquoted or that the Court has the record wrong. Rather, what the government is faulting is the inferences the Court drew from the facts it found and the Court's judgment of the credibility of the witnesses who testified. While it is always fair to ask the Court to reconsider those inferences and even those credibility determinations, it is not fair to do so on what is a ruse, in this case that the Court's view of the facts somehow conflicts with the *memory* of the government.

Nor is it appropriate to argue, as I describe below, that because Dessesaure is allegedly the "prototype of a criminal that Congress had in mind when it enacted certain statutes to combat gun and drug violence," the Court should look the other way when the government presents unlawfully obtained evidence, and be unconcerned when an officer presents contrived testimony. In bringing this case and pursuing it despite the transparent unlawfulness of at least some parts of the investigation, the government has chosen to do just that. This Court will do no such thing.

## II. *DISCUSSION*

Based on that record, the following facts, as I found in my original decision, are also true:

1. That the government decided to prosecute Dessesaure based on the Boston Police investigation, even though there were "serious problems" with that investigation—informants as to whom there was no information on reliability, notes that were "discarded" ten months before the hearing, an apartment search conducted by officers without a warrant or facts excusing a warrant, and information from that improper search used in a subsequent warrant application.

The government counters with a non-sequitur by stating, "it is appropriate to note at the outset that [Dessesaure] is the prototype of the criminal that Congress had in mind when it enacted certain statutes to combat gun and drug violence," as if Congress were suggesting that a defendant who fits a certain prototype forfeits his constitutional rights. The United States Attorney's Office is obliged to screen its prosecutions to determine whether they conform to federal constitutional standards, regardless of the defendant's past history or present conduct.[5] Perhaps other counsel would not have been as vigilant as Dessesaure in moving to suppress an unlawful search; perhaps other counsel would have encouraged him to plead guilty or cooperate. That does not detract from the *government's* independent obligation here to screen its prosecutions to determine their fealty to constitutional—*federal* constitutional—law,[6] not

---

that having done so, he should not have stated that his memorandum was based only on his memory.

5. The government suggests that the Court wrongfully analyzed the local investigation as if it were the equivalent of "an intensive, three-year DEA probe." If by that it means that the Court applied the same federal constitutional standards to this local prosecution that it would have applied to any federal

investigation, the government is correct. That is precisely the point.

6. Indeed, the government's summary of the investigation underscores at least some of the Court's concerns:

The government notes that "in the months before the defendant's arrest, the BPD Drug Control Unit ("DCU") simply was told [certain information] on several occasions by two reliable sources." In fact, the Court

an abstract reference to "certain statutes" or "prototypes."

2. That the Court suggested that Broderick "destroyed" his notes, even though the term "destroyed" was not one that the government "recalls" Officer Broderick using. The Court never suggested that Broderick had used that very word. Rather, the Court's characterization is a fair one based on Broderick's testimony that he "discarded" his notes (Memorandum p. 6.)

3. That the argument that police officers have a right to "freeze" a private apartment before they get a search warrant (when "freezing" means entering and searching it, and communicating the fruits of that search to the officer preparing the warrant affidavit), was "improbably, adopted by government counsel." The government contends that it did not "adopt" the argument that "freezing" the scene in this fashion was appropriate. It only addressed the issues that the defendant raised, and a challenge to "freezing" the scene was not one of them.

The government's position does not remotely respond to the Court's concerns. As noted, the government has an independent obligation to screen its prosecutions that does not depend upon whether defense counsel is or is not attentive to the issue.

4. That Broderick contrived the story that Dessesaure yelled "call my people/peeps" upon his arrest, as if to signal to someone in the crowd to warn his girlfriend to destroy evidence. The government argues that Broderick did not fabri-

cate the statement—that all he did was "misremember" it and "conflat[e] in his mind the concern *the other officers* expressed."

As the government must have been aware, during the hearing Broderick did not refer to "other officers." He referred only to Officer Seoane, and Officer Seoane, even in his less-than-credible testimony on this topic, came nowhere near recounting the statement that Broderick described.

Put simply, the Court found Broderick's testimony not to be credible. He was not at Dessesaure's arrest. He characterized what he claims Officer Seoane said to him. But Seoane did not say anything like that during the hearing, and even what he did say was noticeably absent from the police report. (Memorandum, pp. 14–15). Nevertheless, I agree that the memorandum should be amended to state the fact that the record is not clear about what Officer Broderick specifically knew or did not know of the *Court's* concerns at the moment he took the stand, or whether he gleaned that concern from his questioning at the hearing or from his pre-trial preparation, or was just "gilding the lily," as they say, on his own. What is clear, however, is that even the government concedes that what Broderick reported Dessesaure had said at his arrest was not true, and that no credible statement was made by any government witness that would have created the exigent circumstances necessary for a warrantless search in this case.

5. That while the government is correct that Broderick's statement was that

concluded that the officer had no idea about the reliability of the sources at all, and had "discarded" the notes from conversations with them.

The informants noted that the "defendant was living at a particular location in Quincy and was dealing heroin in Boston from a particular car." Officer Broderick con-

firmed that "this car was, in fact, registered to the defendant at this address." In fact, the Court concluded that the search of the car was the only valid search in the case, that there was no lawful basis for searching Dessesaure's home, based on the circumstances presented.

he did not believe Dessesaure's girlfriend was an "active participant" in drug dealing, and Broderick did not believe she was involved at all, that this does not change the fact that Broderick's account of Dessesaure's station house confessions and waiver of rights was not credible. (Memorandum, p. 16). That conclusion suffices to vitiate any suggestion that the apartment search had been consented to (an alternative ground for a warrantless search).[7]

Nevertheless, the April 13, 2004, Memorandum is further amended to this extent: The issue is not what Broderick believed or did not believe regarding whether Dessesaure's girlfriend could be prosecuted. Whether Broderick believed Dessesaure's girlfriend was an "active participant" in drug dealing or not a participant at all, the issue is what he told Dessesaure and further whether Dessesaure waived his rights because of the threatened prosecution of his girlfriend. Even if I were to believe that Broderick told Dessesaure that they were going to "freeze" the apartment and

that they would not charge his girlfriend with whatever was found in the apartment if he consented to the search, I do not believe Broderick's account that Dessesaure relented and gave the officers the information they needed.

■ 6. That there is no merit to the government's argument that the officers had a right to take Dessesaure's girlfriend, Tina Tate, out of the apartment, in an arguable "protective sweep," and therefore, since they would have made the same observations of heroin and drug trafficking paraphernalia in doing so, the search was somehow lawful.

The government supposes in its motion for reconsideration that the Court "assumes... that entering the apartment to remove the girlfriend would have been permissible." The Court assumes no such thing, since such a finding would be absolutely inconsistent with the Fourth Amendment, even under the most lenient reading.[8]

---

7. Significantly, even the searching officers did not rely on Dessesaure's alleged authorization of consent; they sought a warrant to search the apartment, albeit after they had already entered and searched it without one.

8. Numerous courts have held that the protective sweep concept described by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) is only permitted when conducted in connection with an arrest. *See United States v. Reid*, 226 F.3d 1020 (9th Cir.2000); *United States v. Wilson*, 36 F.3d 1298, 1306 (5th Cir.1994); *United States v. Vargas*, 2003 WL 21313721 (E.D.N.Y. May 28, 2003) (all holding that *Buie* authorizes protective sweeps only when made incident to arrest.)

While the Sixth Circuit and the D.C. Circuit have held that *Buie* can be expanded beyond the incident to arrest context, neither came anywhere near allowing what took place here. *See United States v. Patrick*, 959 F.2d 991 (D.C.Cir.1992) (allowing protective sweep where *officers had consent to search an apartment* and once inside entered an open bed-

room door for security reasons); *United States v. Taylor*, 248 F.3d 506 (6th Cir.2001) (allowing protective sweep by officers securing apartment while waiting for a warrant where *officers had probable cause to search the apartment prior to entering and had articulable facts to support their belief that there were persons in the apartment who posed a threat to their safety*.)

The Sixth Circuit's holding in *Taylor* is inconsistent with the Supreme Court's ruling in *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). However, even under *Taylor*'s expansive reading of protective sweep doctrine, what the officers did in this case would fail. As this Court detailed in the April 13, 2004, Memorandum, the officers in this case absolutely did not have probable cause to search the apartment prior to their warrantless entry. What is more, the government presented zero evidence that there may have been a person in the apartment who posed a threat to the officers' safety. The government's explanation for entering the apartment—which Broderick made

■ What is more, even if the circumstances were such that a protective sweep would have been justified, what the officers did in this case bears no resemblance to the "quick and limited search of premises ... to protect themselves or others" the Supreme Court described in *Buie*. 494 U.S. at 327, 110 S.Ct. 1093. The Court found that Broderick entered, along with five to nine other officers, because he believed that he had a right to "freeze" the apartment while waiting for a warrant. The Court further found that to Broderick, freezing meant searching everywhere and communicating his observations to the waiting officer who was preparing the affidavit. What would have happened had the

officers performed a valid protective sweep only is speculation.

7. That what Broderick did could not have appeared to be acceptable based on precedent of the Massachusetts Supreme Judicial Court, even at that time.[9] The government argues that at the time of the search, SJC precedent "suggested their actions were reasonable." An examination of the cases cited by the government for this proposition reveals without question that the search performed by Broderick and the other officers was never acceptable under the SJC's standards.[10]

### III. *CONCLUSION*

Accordingly, the government's Motion To Reconsider [document # 35] is **DE-**

---

clear through his repeated discussion of Dessesaure's supposed "call my people/peeps" comment—was that they feared Tate might destroy evidence. Having rejected the government's suggestion that any such comment was made and consequently rejecting the government's argument that exigent circumstances existed to enter the apartment without a warrant, the government has not presented even the slightest support for an alternative argument that the warrantless entry was justified by probable cause to search combined with reasonable fear for the officers' safety.

9. The supposed significance of the government's argument is that it bears on Broderick's credibility, since obviously the standard at issue here is current federal constitutional law. For the numerous other reasons discussed in detail above and in the April 13, 2004, Memorandum, Broderick's credibility could not be salvaged by establishing that the Supreme Judicial Court of Massachusetts would have allowed his conduct at the time. It is worth pointing out, however, that the SJC would have allowed no such thing. *See* FN 9.

10. In *Commonwealth v. Alvarez*, 422 Mass. 198, 661 N.E.2d 1293 (Mass.1996), the case most prominently cited by the government for this point, the officers had gone in to see if anyone was in the apartment, and then left and secured the entrances when they determined the apartment was empty. They did

not see anything in there that they used in the warrant, so their warrantless search had no effect. The SJC did say that their checking the apartment was reasonable, but it said in the next sentence that "[i]t is also important to note that no information obtained in this search was used to obtain the subsequent search warrant. Thus, the warrant was not tainted by the warrantless search of the apartment." *Id.* at 210–11, 661 N.E.2d 1293.

Unlike the instant case, probable cause existed in *Alvarez* at the time the officers entered the apartment, not only to search it, but to believe that securing the apartment was necessary to prevent the destruction of evidence. See *Commonwealth v. Burgos*, 2000 WL 1137708 (Mass.Super.July 14, 2000) (noting that the finding of probable cause regarding the destruction of evidence was significant to the SJC's finding in *Alvarez*). The facts and holding in *Alvarez* parallel those of *Taylor*, 248 F.3d 506, which as described above, constitutes a significant departure from the facts of this case and likely also a departure from the Supreme Court's Fourth Amendment precedent. *See* FN 7.

In *Burgos*, the other case cited by the government, the Court found it critical that the police "had probable cause to believe that securing the apartment was necessary to prevent the destruction of evidence." *Burgos*, 2000 WL 1137708 at *7. That is among the things that were fatally not present here.

**NIED,** and this Court's April 13, 2004, Memorandum is amended as described above.[11]

**SO ORDERED.**

11. The original memorandum is also amended to reflect the fact that Dessesaure may well have been driving erratically even while going on a routine errand with his girlfriend. It does not affect any of the underlying findings.