Agnes, A.J.
Introduction
The defendant is charged with a variety of drug offenses including possession and distribution charges relating to heroin, cocaine, and marijuana among others as set forth in an eleven-count indictment. He has filed a pretrial motion to suppress evidence seized by the Worcester Police during a series of events on September 16, 2002 as described below.
Findings of Fact
On September 16, 2002, members of the Worcester Police department Vice Squad, under the direction of Sergeant Timothy O’Connor, were engaged in an investigation of illegal drug selling by the defendant Aaron Wade. Sergeant O’Connor has been a member of the Worcester Police department for 20 years, and has worked in the Vice Squad for 15 years. He has been a Sergeant for 2 years. His duties include supervision of the day shift. On September 16, 2002, he arrived at work at 6:00 a.m. to prepare for a 6:30 a.m. briefing where he outlined the day’s work for the other members of the squad. The target of the investigation was the defendant, Aaron Wade. On September 12, 2002, Sergeant O’Connor obtained a search warrant for the defendant’s apartment at 15 Liberty Street. See exhibit 7.[1] He also obtained a warrant to search the defendant’s vehicle, a 1995 green Ford Explorer. He took up a position in a lot at 85 Prospect Street which he also described as a target of the investigation.
Sergeant O’Connor saw the defendant exit 85 Prospect Street and enter a Green Ford Explorer. The defendant began to drive away when a female (later identified as the defendant’s girlfriend, Sarah Hebert), exited from 85 Prospect Street, waved him down and handed something to him. The parties kissed. The defendant drove off in his Ford Explorer and Ms. Hebert left in another vehicle. Sergeant O’Connor, who was watching the whole scene, testified that the defendant met his girlfriend a distance away from 85 Prospect Street and handed him a plastic baggie which she retrieved from her vehicle. Based upon my assessment of the witnesses, especially Ms. Hebert, and a consideration of the totality of the evidence, I do not credit this testimony by Sergeant O’Connor concerning the suspicious exchange between the defendant and his girlfriend.
Sergeant O’Connor contacted the other officer involved in the investigation and reported that there had been a suspicious exchange between the defendant and his girlfriend involving a plastic baggie. He gave instructions to arrest the defendant and to stop Ms. Hebert, search her vehicle, and bring her back to 15 Liberty Street.
Officer Sandberg is in his 37th year as a member of the Worcester Police Department and for 30 of those years he has worked as a member of the Vice Squad with a focus on illegal drugs activities in the city. In his career he has been involved in thousands of drug cases. On September 16, 2002, he was assisting in the Wade investigation. He was instructed to conduct surveillance in the vicinity of 7 Liberty Street in Worcester, and to contact Sergeant O’Connor if the target appeared. He was told that under no circumstances should the defendant be permitted to enter his home. Officer Sandberg was watching for a green, 4-door Ford Explorer vehicle believed to belong to the defendant. At approximately 7:45 a.m., he saw the vehicle approaching his position. He notified Sergeant O’Connor. Before it reached his position, it pulled into a vacant lot across the street from 15 Liberiy Street. Exhibit 2 (photograph).
Officer Sandberg was aware that the Worcester Police had obtained a search warrant for the vehicle and for the defendant’s home at 15 Liberiy Street. The defendant parked his vehicle and exited it. He began to walk towards 15 Liberty Street. Officer Sandberg identified himself to the defendant and showed him his badge. The defendant was told he was under arrest for selling crack cocaine and was placed in handcuffs.
*126 Soon thereafter, Sergeant Timothy O’Connor and officer O’Malley appeared at the scene. Other officers soon arrived. Sergeant O’Connor showed the defendant the search warrants for 15 Liberty Street and the Ford Explorer. He advised the defendant of his Miranda rights. The defendant was not asked whether he understood his rights. The defendant did not indicate that he wished to speak to the police.
At some point thereafter, the police conducted a search of the defendant’s vehicle.[2] During the search, the police seized plastic packets containing green vegetable matter, later determined to be marijuana, and white powder later determined to be heroin. The police also seized $306.00 in cash from the vehicle console. The registration for the vehicle was found in the glove box and it revealed that the defendant, Aaron Wade, was the registered owner of the vehicle. The defendant was advised of his Miranda rights.
The defendant was led by the officers, including officer James O’Rourke, a 19-year veteran of the Worcester Police Department, inside the apartment at 15 Liberty Street Exhibit 1 (photograph). In addition to the police, several male friends of the defendant were present.[3] The defendant was seated on a sofa in the front room. The defendant was searched. No drugs were found on his person. He told the police there were no drugs in the apartment. At some point, his girlfriend arrived and took a seat in the same area. She too was in handcuffs. Exhibit 6. As soon as Sarah Hebert arrived, Officer O’Rourke made a remark that this was the location where the defendant brought his prostitutes.[4] Although the police conducted a thorough search of 15 Liberty Street, no drugs were found at that location. Sergeant O’Connor asked him whether he kept his “stash” at his other apartment (85 Prospect Street), and whether he (the defendant) was going to “help them out.” The defendant said “I thought I had a right to a lawyer?” Sergeant O’Connor responded by stating, “What? Do you think this is a fucking game?”[5]
Sergeant O’Connor told him that he intended to arrest his girlfriend and charge her with possession of the drugs that were found in the Ford Explorer. The defendant asked to speak to an attorney. Sergeant O’Connor turned to another officer and said “go arrest the bitch.” At this point, the defendant said he would cooperate if his girlfriend was not arrested. Sergeant O’Connor procured a consent to search form. Exhibit 4. Sergeant O’Connor asked him to sign it. The defendant said, “I don’t read well.” No one read the form to the defendant. The defendant did not read the form, but he did sign it. See exhibit 4.[6] I find, in particular, that while the defendant appears to be a person of at least average intelligence, he reads at a very low level and was not capable of reading and understanding the consent form without assistance.[7] The defendant was then brought to 85 Prospect Street which is only a short distance away from 15 Liberty Street.
Based on the purported “consent” to search supplied by the defendant[8] the police conducted a search of apartment 2 at 85 Prospect Street. The police seized quantities of marijuana, cocaine and heroin (as well as some loose pills) from locations inside the kitchen and elsewhere. The police also seized United States currency in the amount of $16,920.
For the past four years, the defendant and his girlfriend lived together (with his children) at 85 Prospect Street. They now have a child together which he supports. Ms. Hebert had not been to 15 Liberty Street before the day in question.[9] When she was observed by Sergeant O’Connor on the morning of September 16, 2002, she was leaving the house right after the defendant. She waved to the defendant and ran over to him to give him his license which he had left inside her car. It was a license she handed to the defendant. She left the area and was on her way to route 9 when she was stopped in the middle of the roadway by Worcester Police Officer Robert Lombardi, a 28-year veteran of the police force with 8 years of service in the Vice Squad. He was operating a red pick-up truck at the time. Officer Daniel O’Connor assisted him. Officer O’Connor was following Ms. Hebert’s car in an unmarked police van at Sergeant O’Connor instructions. After activating his blue lights, he pulled Ms. Hebert over. He showed her his badge and ordered her out of the vehicle. She was placed in handcuffs. The police went through all of the contents of her vehicle, including her handbag. In her words, which I credit, the police “trashed” her vehicle. She was ordered to get inside an unmarked police van and taken to 15 Liberty Street. Ms. Hebert, who happens to be white, was asked by the police “what’s a nice young girl doing with him?” The defendant happens to be black.
Once she got to 15 Liberty Street, Sergeant O’Connor placed her in handcuffs. She was advised of her Miranda rights.
Rulings of Law
1. Whether the police had probable cause to arrest the defendant when he arrived at 15 Liberty Street.
As noted above, the police had a search warrant for the defendant’s apartment and for his vehicle. As soon as he arrived at that location on September 16, 2002, he was handcuffed and placed under arrest. The Commonwealth maintains that the affidavits by Worcester Police Officer Larry T. Williams in support of those warrants establish probable cause for the defendant’s arrest.
According to Officer Williams’s affidavits of September 12, 2002, the Worcester Police Vice Squad received information from a confidential informant who said it had been purchasing cocaine “from a black male approximately 6 feet tall, about thirty years old, who drives a green sport utility vehicle.” Arrangements were made for the Cl to purchase cocaine from this person. According to the Williams’ affidavit:
*127 On or about 8/6/02, Sgt. O’Connor had conversation with the CI and made arrangements for the CI to purchase cocaine from this male. The CI made contact with the male and made arrangements for the CI to purchase cocaine from him. Vice Officers set up surveillance on the Cl’s location and waited. Within a short time, Officers observed a green Ford Explorer (806NN) pull up and the operator got out to meet with the CI. The operator was observed by officers to be a black male, about 30 years old, about 6 feet tall, 190 pounds, hed (sic) shaved bald. The operator then got back in his Explorer and was followed back to 15 Liberty Street. The Vice Squad was currently investigating 15 Liberty Street, due to neighbor complaints in July of drugs being sold at (sic) from this address. The CI returned to meet with the Vice officers and stated that she/he purchased cocaine from the male driving the Explorer. A Massachusetts Registry listing on 9806NN comes back to a 1995 green Ford Explorer, registered to Aaron T. Wade (DOB 2/20/73) at 85 Prospect Street, Worcester, Mass. A check of Worcester Police records shows an Aaron Wade, same DOB, with an arrest record in Worcester. A booking photo of Wade was obtained from BCI. Officer recognized Wade as the same subject operating the Explorer, who met with the CI.
Further investigation revealed that Aaron T. Wade and his girlfriend Michelle McBride have owned 15 Liberty Street, Worcester, Ma. Since 1995. The next day, the same booking photo of Wade was shown to the CI. The CI stated that this is the person who he/she has been buying cocaine from in the green sport utility vehicle.
On or about 9/11/2002, Sgt. O’Connor made arrangements with the CI (sic) take made another purchase from Wade. Vice Officers observed Wade’s green Ford Explorer (9806NN) parked at 15 Liberty Street in Worcester and set up surveillance on that address. The CI was then instructed to make contact with Wade. The CI made contact with (sic) the Wade and made arrangements to obtain an undisclosed quantity of cocaine. Within minutes, Wade was observed by Vice Officers leaving 15 Liberty and getting into the Ford Explorer. Wade was followed by the officers until he met with the CI. Wade then returned to 15 Liberty Street. The CI then met with Sgt. O’Connor and stated that he had just purchased cocaine again from the male operating the green sport utility vehicle. Based on the appearance and packaging of the substance, Vice Officers believe it to be cocaine.
Excerpt of the Affidavit of Officer Larry Williams pp. 2-3.[10]
When as in this case an application for a search warrant is based on information supplied by an unidentified[11] confidential informant, Article 14 of the Massachusetts Declaration of Rights requires that we adhere to the test enunciated by the United States Supreme Court in Aguilar v. Texas, 378 U.S. 108 (1964), amplified in Spinelli v. United States, 393 U.S. 410 (1969), whereby there must be a demonstration in the affidavit or other supporting material (1) that the informant had a sufficient basis of knowledge and (2) that the informant is a credible person or his information is reliable. Commonwealth v. Perez-Baez, 410 Mass. 43 (1991). Here, the statements attributed to the CI that it purchased cocaine on two occasions from the defendant satisfies the basis of knowledge requirement. Commonwealth v. Alvarez, 422 Mass. 198, 205 (1996), quoting from Commonwealth v. Allen, 406 Mass. 575, 578 (1990) (“First-hand receipt of information through personal observation satisfies the basis of knowledge prong of Aguilar-Spinelli"). See also Commonwealth v. Vasquez, 59 Mass.App.Ct. 111, 117 (2003).
With regard to the credibility of the informant or the reliability of its information, the picture presented by the affidavits submitted by Officer Williams is decidedly murky. The affidavits indicate that the CI is reliable because it has given information to the police “in the past which has proven to be reliable and true. Information provided by this CI in the past has led to arrests for drug violations and the execution of search warrants. These search warrants has (sic) resulted in the seizure of drugs and money, and arrests for drug violations. These arrests have resulted in convictions in Worcester District and Superior Court.” The sine qua non of a statement about the past performance of a confidential informant that qualifies it as a sufficient underlying circumstance for purposes of the AguilarSpinellitest is “meaningful detail” about the informer’s past performance. See Commonwealth v. Mejia, 411 Mass. 108, 114 (1991). A naked assertion that an unidentified informant has given the police information in the past that led to arrests, seizures of drugs and money, and convictions, with no specification in terms of any particular cases and no specification of when the information was supplied lacks sufficient detail to support an inference that the informant is reliable. Contrast Commonwealth v. Fernandes, 30 Mass.App.Ct. 335, 341 (1991) (the affidavit clearly spelled out the role played by the informants); Commonwealth v. Cowell, 57 Mass.App.Ct. 1115 (2003) (same).
In terms of whether the conduct of the police corroborated the information supplied by the informant, it is important to consider that what took place in this case did not meet the well established standards for a controlled buys. “Generally, a ‘controlled buy’ has, at a minimum, these components: (1) a police officer meets the informant at a location other than the location where is it suspected that criminal activity is occurring; (2) the officer .searches the informant to ensure the informant has no drugs on his person and (usually) furnishes the informant with money to pur *128 chase drugs; (3) the officer escorts or follows the informant to the premises where it is alleged illegal activity is occurring and watches the informant enter and leave those premises; and (4) the informant turns over to the officer the substance the informant has purchased from the residents of the premises under surveillance.” Commonwealth v. Desper, 419 Mass. 163, 168 (1994).[12]
Nonetheless, despite the fact that the two applications for a search warrant in this case were far from models, under controlling precedents, they were sufficient to establish the credibility of the informant. See Desper, supra, 419 Mass, at 170-71. For these reasons, the police had probable cause to arrest the defendant when they encountered him outside 15 Liberty Street on September 16, 2002.
2. Whether the police had probable cause to search the defendant’s vehicle or his home at 15 Liberty Street.
Simply because there is probable cause to believe that a person is guilty of selling drugs, does not necessarily constitute probable cause to search his vehicle or his home. Commonwealth v. Cinelli, 389 Mass. 197, 213, cert, denied, 464 U.S. 860 (1983). The question is whether there was a sufficient nexus between the criminal activity described in the affidavits and the places to be searched. See id. at 213. In this case, there is no information in the affidavit that suggests drugs were ever seen in the defendant’s vehicle or home, nor that indicates where, if at all, the defendant stored drugs. Contrast Commonwealth v. Avery, 365 Mass. 59 (1974). Furthermore, in the present case, there is no evidence that any of the drug sales occurred in or around the defendant’s vehicle or home,[13] and there is no evidence from the police surveillance that activity consistent with drug selling was taking place in the defendant’s vehicle or home. Contrast Commonwealth v. Almeida, 15 Mass. L. Rptr. 332 (Superior Court 2002).[14]
This case is controlled by a line of decisions from the Appeals Court which hold that the mere fact that the police gather evidence that a person travels from his home to some other location such as a business or a street corner to sell drugs, even in circumstances where the target is observed to leave his home in response to the informant’s or undercover officer’s call and solicitation for a drug sale, does not, without more, supply probable cause for a search of the suspect’s home. For example, in Commonwealth v. Smith, 57 Mass.App.Ct. 907 (2003), the Court considered an affidavit in which the confidential informant had no knowledge of any drug activity inside the defendant’s home, and never claimed to have been inside it. The informant did not allege that drugs were stored in the defendant’s home. Police, surveillance established only that the defendant returned to his home after a drug sale at another location. These facts were not sufficient to warrant probable cause to search the defendant’s home. Accord, Commonwealth v. O’Day, 56 Mass.App.Ct. 833 (2002) (The affidavit related that the defendant lived at a certain address and on two occasions was observed driving directly from his residence to his workplace where he proceeded to conduct drug transactions, including two controlled buys. There also was evidence that an undetermined number of cars made brief visits to the defendant’s home during two periods of surveillance conducted three weeks apart. Not sufficient to establish a nexus between the defendant’s drug selling and his home); Commonwealth v. Olivares, 30 Mass.App.Ct. 596 (1991) (no specific information in the affidavit connecting defendant’s residence to drug sales except observation of defendant departing from house and going to his place of business where controlled buy occurred).
The same analysis leads to the conclusion that there was no probable cause for the search of the defendant’s vehicle. There no basis for the assumption that because a person has drugs on his person (a reasonable inference from the facts in this case since the drug sales took place outside the vehicle), he has drugs stored in his vehicle. See Commonwealth v. Alvarado, 420 Mass. 542, 554-55 (1995). This case does not fall under the well established rule that “observation of contraband in a vehicle or on the person of an occupant of a vehicle provides probable cause for a complete search for more contraband.” Commonwealth v. Miller, 366 Mass. 387, 389 (1974). For these reasons, the two warrants authorizing the police to search the defendant’s vehicle and his apartment are invalid because they are not supported by probable cause.
3. Whether the search of the defendant’s vehicle was valid as a search incident to an arrest.
There is no evidence that the defendant parked his vehicle illegally on the morning of September 16,2002, when he pulled into the vacant lot across from 15 Liberty Street. “A search incident to arrest is limited to the area within the arrestee’s immediate control as its purpose is to protect the arresting officer from weapons and to prevent the destruction of evidence, which may be within the arrestee’s reach. A search of an automobile incident to an arrest must be made ‘contemporaneous’ with the arrest of any occupant of the vehicle.” Commonwealth v. Alvarado, 420 Mass. 542, 554 (1995) (citations omitted). See Commonwealth v. Santiago, 410 Mass. 737, 743 (1991) (“The purpose, long established, of a search incident to an arrest is to prevent an individual from destroying or concealing evidence of the crime for which the police have probable cause to arrest, or to prevent an individual from acquiring a weapon to resist arrest or to facilitate an escape. A search incident to arrest, similar to the search of a person pursuant to a warrant, generally is limited for purposes of both the Fourth *129 Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, to the body of the person arrested and the area and items within his or her immediate possession and control at the time.”).
The search incident to arrest doctrine is not rendered inoperative simply because the subject of the arrest is in the physical custody of the police, and does not require a demonstration that there was a likelihood that the arrested person could reach for a weapon or to destroy contraband that was inside the vehicle. However, as an exception to the warrant requirement, the burden of establishing the existence of the facts and circumstances that give rise to the doctrine rests with the Commonwealth. One such circumstance is that the defendant must be in sufficient proximity to the vehicle to make it at least possible that he could reach inside it. Santiago, supra, 410 Mass, at 743. On the facts before me, the Commonwealth has not met its burden of establishing that the defendant was in sufficient proximity to the vehicle to warrant application of the search incident to the arrest doctrine. Accordingly, the evidence seized from the defendant’s vehicle must be suppressed.
4. Whether the defendant made a valid waiver of his Miranda rights.
The above findings of fact indicate that following his arrest outside of his vehicle, the defendant was advised of his Miranda rights. I assume that being “advised of his rights" consisted of an accurate and complete recitation of the essential Miranda warnings. There is no serious dispute that he was under arrest and in police custody at the time. However, the defendant was not asked whether he understood his rights, nor did he indicate that he wished to speak to the police. The defendant was not asked to sign a Miranda waiver form nor did the police use a Miranda card that could be initialed to indicate a waiver by the defendant. The conversation that followed between the police and the defendant after he was advised of his rights was focused on two matters — the location of drugs that the police believed belonged to the defendant, and whether he was willing to consent to the search of 85 Prospect Street to save his girlfriend from being arrested.
“The Commonwealth bears the burden of proving the validity of a Miranda waiver beyond a reasonable doubt. To be valid the waiver must be made voluntarily, knowingly, and intelligently. The Commonwealth must also prove beyond a reasonable doubt that the statements were made voluntarily. A statement is voluntaiy if it is the product of a rational intellect and a free will. Although the validity of a defendant’s Miranda waiver and the voluntariness of his statements are separate inquiries, we use a totality of the circumstances test for both.” Commonwealth v. Jones, 439 Mass. 249, 256-57 (2003) (citations and quotations omitted). Since the decision in Miranda v. United States, 384 U.S. 436 (1966), nearly forty years ago, both the Supreme Judicial Court and the United States Court have reiterated that “t[]he ‘heavy’ burden of proving a waiver of a constitutional right is on the Commonwealth. Explicit statements that [the defendant] understood his rights and waived them [are] not essential. [However,] courts indulge every reasonable presumption against waiver of fundamental constitutional rights.” Commonwealth v. Boncore, 412 Mass. 1013, 1015 (1992). “The intention to waive constitutional rights must be made clear, without implication, inveiglement or subtlety . . .” Commonwealth v. Dustin, 373 Mass. 612, 615 (1977).
In some cases, a person who has been arrested may indicate some interest in access to a lawyer without invoking the right to counsel. See, e.g., Commonwealth v. Pennellatore, 392 Mass. 362 (1984) (“The defendant’s isolated statement, ‘I guess I’ll have to have a lawyer for this,’ when viewed in context, appears to be an acknowledgment of the serious nature of the charges facing him, directed in response to the police officer’s comment regarding the crimes listed on the booking sheet, rather than a request for an attorney during interrogation”). The question is whether the defendant has made an affirmative request for an attorney or simply an equivocal statement concerning the need for an attorney. Commonwealth v. Obershaw, 435 Mass. 794, 801 (2002), and cases cited.
In the present case, the first statement made by the defendant following receipt of his Miranda warnings was a denial that there were any drugs at 15 Liberty Street. When the police questioned him further, he asked about an attorney. While that statement alone might not suffice as an invocation of the right to counsel, it created a situation in which the police had an obligation not to do or say anything that burdened or diminished his right to counsel. They could, for example, seek clarification by asking him, in neutral terms, whether he wanted to speak to them, or once again explain to him his Miranda rights. The response that was made by the police (“What? Do you think this is a fucking game?”) violated their obligation to “scrupulously honor” his rights, see Commonwealth v. Magee, 423 Mass. 381, 386 (1996), and renders any claim that the defendant thereafter waived his Miranda rights fatally deficient. Furthermore, the next statement by the defendant was an unequivocal assertion of his right to counsel. At that point, the police were obliged to terminate all questioning. See Commonwealth v. Contos, 435 Mass. 19, 30 (2001) (“Statements obtained following an invocation of the right to counsel are presumed involuntary unless the Commonwealth proves beyond a reasonable doubt that the defendant initiated further communication, exchanges, or conversations with the police, and thereby voluntarily, knowingly, and intelligently waived his right to counsel”) (citations and quotations omitted). See also Edwards v. Arizona, 451 U.S. 477, 484 (1981) (“[V]alid waiver of [the] right [to counsel] cannot be *130 established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights”); Commonwealth v. Judge, 420 Mass. 433, 448 (1995), quoting McNeil v. Wisconsin, 501 U.S. 171, 177 (1991) (in circumstances in which the police continue to question a defendant who has previously asserted the right to counsel in the absence of counsel, all statements are presumed involuntary and, therefore, inadmissible at trial, even if the defendant has executed a waiver form).
Based on the foregoing, any and all statement made by the defendant following his first reference to an attorney (thus, everything following his denial that there were any drugs in the home) must be suppressed because they were obtained during custodial interrogation without a valid waiver of his Miranda rights.
5. Whether the defendant voluntarily consented to a search of 85 Prospect Street.
The above facts establish that the police obtained the defendant’s signature to the consent form and his permission to allow the search of 85 Prospect Street by exploiting their violation of his Miranda rights. “When consent to search is obtained through exploitation of a prior illegalily, particularly very close in time following the prior illegalily, the consent has not been regarded as freely given.” Commonwealth v. Kipp, 57 Mass.App.Ct. 629, 633 (2003), quoting Commonwealth v. Midi, 46 Mass.App.Ct. 591, 595 (1999).
However, even apart from the exploitation of the Miranda violation, the police did not obtain the defendant’s voluntary consent to search in this case. The test in this Commonwealth for determining whether the police obtained valid consent for a search is set forth in Commonwealth v. Harmond, 376 Mass. 557, 561-62 (1978):
When the Commonwealth relies on consent as the basis for a warrantless search, it must demonstrate consent unfettered by coercion, express or implied . . . [which is] something more than mere acquiescence to a claim of lawful authority. Voluntariness of consent is a question of fact to be determined in the circumstances of each case . . . The neglect or failure of the police to explain the right of the defendant to refuse to consent to a search is a factor suggesting coercion, but it is not conclusive. This is true even when a suspect is in custody when asked for permission to search. Similarly, it is inconclusive on the question of voluntariness that the police announced their intention to seek a search warrant if consent were not forthcoming. Although the presence of several uniformed offices or the impairment of the defendant’s understanding by reason of drinking may suggest the absence of consent, neither fact alone necessarily compels such a finding. Finally, knowledge that a search will inevitably produce incriminating evidence does not automatically preclude a finding of voluntary consent.
In this case, the police thought that it was important to obtain the defendant’s signature on a written consent form. He told them he didn’t read well. There is no evidence that the form was read to him or explained to him. The fact that he didn’t make a specific objection to signing the form is not evidence of his consent. Commonwealth v. Vasquez, 16 Mass. L. Rptr. 1 (Mass. Super. 2003).
Moreover, it appears that the defendant was induced to sign the form after he was threatened that his girlfriend would be arrested. Ordinarily, a concern for the welfare of another does not render involuntary a defendant’s waiver of a constitutional right. If the police had probable cause to arrest Ms. Hebert, a decision by the defendant to cooperate by consenting to a search in an effort to secure the freedom of Ms. Hebert would not have rendered his consent involuntary. Here, however, based on the facts found, the police had no justification for the stop and detention of Sarah Hebert, and thus no right to use her as bait in an effort to obtain the defendant’s consent to a search.
The conduct of the police with regard to Ms. Hebert was unlawful. Reasonable suspicion must be based on specific and articulable facts and any reasonable inferences that follow from those facts in light of the officer’s knowledge and experience. Commonwealth v. Silva, 366 Mass. 402, 406 (1974). The police are not permitted to stop and detain a motorist, even for a brief period, on the basis of a mere hunch or speculation that criminal activity is afoot. Commonwealth v. Smith, 55 Mass.App.Ct. 569, 572 (2002), quoting Commonwealth v. Watson, 430 Mass. 725, 729 (2000). No observations were made of any activity involving Sarah Hebert that gave rise to probable cause or reasonable suspicion that she was involved in illegal drug activity.[15] See Commonwealth v. Thibeau, 384 Mass. 762, 763 (1981). The police had no information suggesting that the vehicle in which she was driving had any connection to criminal activity, and certainly no information linking her to the illegal conduct involving the defendant. Commonwealth v. Swanson, 56 Mass.App.Ct. 459, 462-63 (2002) (“[N]o contraband was observed; no suspicious conduct was observed. In these circumstances, we conclude that police did not have a reasonable basis for believing that a crime was afoot.”). See Commonwealth v. Elevines, 438 Mass. 604, 609-10 (2003). Motor vehicle stops or detentions of persons on the street in such circumstances constitute serious, and not trifling, invasions of personal liberty.[16] For these reasons, the defendant did not voluntarily consent to the search of 85 Prospect Street. Because the police lacked any evidence of illegal drug activity at that location, their entry and search of 85 Prospect Street was unlawful.
Conclusion
The damage caused to people’s health and our economy by illegal drugs is staggering.[17] The problem *131 is growing worse, not getting better.[18] Our nation is engaged in a great debate about how best to deal with this problem. Some advocate that we should place greater stress on education and treatment initiatives, while others maintain that we must maintain a robust law enforcement capacity and insist on stiff penalties, including lengthy, mandatory sentences for violators to control the drug problem. The responsibility for assessing these alternative strategies and setting the Commonwealth’s policy lies with the Legislature and the Governor. However, as long as a priority is placed on the law enforcement approach to the eradication of the drug problem, every person in this Commonwealth has an interest in insuring that the police observe the limits imposed by our state and federal constitutions and laws. In this case, those limits were not observed.
The Worcester Police Department had information on or about September 12, 2002 that suggested that the defendant was involved in illegal drug sales. The specific nature of that information is unclear since it is described as coming from a confidential informant (apparently known only to Sergeant O’Connor)[19] and neighborhood complaints in the affidavits by officer Larry Williams. The police could have developed this information further by conducting surveillances and genuine controlled buys that would have either dispelled their suspicions or established an unassailable case of probable cause. Although they obtained search warrants, they resorted to short cuts and subterfuges when those warrants did not produce the results they sought. They detained Sarah Hebert and searched her vehicle without probable cause or reasonable suspicion of wrongdoing. They threatened to arrest Sarah Hebert, without justification, in an effort to induce the defendant to cooperate. They ignored the defendant’s request for an attorney, and obtained his signature on a consent to search form even though he can barely read. While the defendant may indeed have been engaged in illegal activities in September 2002, certain officers of the Worcester Police Department set out to make a case against him by using shortcuts that undermine the constitutional rights of all of us.
The tactics used by the police in this case should be of concern to a wider audience than those involved directly in this case. “The community that fails to insist on scrupulous observance of high standards by its police and prosecutors has lost track of its fundamental purposes, and courts that approve well-meaning but unconstitutional conduct by law enforcement officers, even in the case of undoubtedly guilty defendants, deal the administration of justice and the integrity of the legal process a greater blow than when they permit a particular criminal to delay, or sometimes even wholly to escape, due punishment by insisting on an untainted, constitutionally correct trial.” Commonwealth v. DiGeronimo, 38 Mass.App.Ct. 714, 728 n. 18 (1995) (Laurence, J.) (citations omitted).
Order
For the above reasons, the defendant’s motion to suppress evidence in the form of statements made to the Worcester Police on September 16, 2002 (with the exception of his denial of the existence of any drugs at 15 Liberty Street) and physical evidence, including quantities of marijuana, cocaine and heroin, seized by the Worcester Police from his green Ford Explorer, his home at 15 Liberty Street and his home at 85 Prospect Street is ALLOWED.

 The search warrants for the defendant’s apartment and vehicle and the corresponding applications and affidavits were made part of the record and are attached to the Commonwealth’s Memorandum of Law in Opposition to the defendant’s motion to suppress.

 here is no evidence about precisely when this search took place, or precisely where the defendant and the police officers were at the time of this search. From the credible evidence that was presented, I find that when this search took place the defendant’s vehicle was lawfully parked in the vacant lot across the street from 15 Liberty Street, that the defendant was outside the vehicle and some distance away from it, that he was in handcuffs and in the presence of at least three other police officers, and that no other civilians were in the vicinity.

 These persons were later released and were not charged with any crimes.

 The remark (“Make sure you do a good job; this is where he brings his hookers to smoke crack”) was made to one of the other officers conducting the search of 15 Liberty Street but within the hearing of the defendant and Ms. Hebert. There was no evidence offered to substantiate this charge, and no reference to the involvement of prostitutes in any of the police reports involved in this case.

 Sergeant O’Connor offered a different account. His testimony was that the defendant appeared calm and relaxed until one of the officers mentioned that the apartment at 15 Liberty Street was where the defendant brought his prostitutes. At that point, according to Sergeant O’Connor, the defendant asked to speak to the police outside of Ms. Hebert’s hearing in the adjoining room. There, he offered to cooperate after again being advised of his Miranda rights. According to Sergeant O’Connor, the defendant at no time asked to speak to an attorney. Based upon a consideration of all of the evidence, especially the testimony by Sarah Hebert and the defendant with respect to the events that took place prior to and during the events at 15 Liberty Street, I do not credit this testimony. I also do not credit the testimony by Officer O’Rourke that while inside his apartment at 15 Liberty Street the defendant stated that he was in possession or control of a large quantity of drugs.

 The consent form also contains a Miranda waiver form within it. Under the circumstances, this aspect of the form has no material effect on the question whether the police obtained a valid waiver of his Miranda rights. See text infra

 I credit the testimony of Sarah Hebert that she assists the defendant with a landscaping business by doing all of his billing and paperwork because he reads so poorly. I also credit the testimony of Dennis Colzie, a self-employed rubbish collector who has known and worked with the defendant for ten years and has personal knowledge of the defendant’s inability to read simple instructions relating to their work.

 The police never applied for a search warrant to search 85 Prospect Street.

 15 Liberty Street is owned jointly by the defendant and his former girlfriend.

 The affidavits submitted in support of the two search warrants are identical.

 There is nothing in the affidavit that suggests the police know the identity of the confidential informant, or his or her whereabouts. Thus, there is no basis for applying a relaxed standard to measure whether the Commonwealth has sustained its burden under the Aguilar-Spinelli test. See Commonwealth v. Alfonso, 438 Mass. 372 (2003).

 For example, in Commonwealth v. Garcia, 49 Mass.App.Ct. 1117 (2000), the Appeals Court observed that “Detective Gallo met the informant at the place of the controlled buy; he searched the informant, and ascertained that the informant was not carrying any money or narcotics; he watched the informant enter and, between two and four minutes later, leave the building. He then received the narcotic item purchased from the defendant, searched him again, and found no money or additional contraband. The results of this carefully supervised controlled buy demonstrated the reliabiliiy and credibility of the confidential informant and, with other evidence, provided probable cause for the search warrant to issue.” None of that occurred in this case. See also Commonwealth v. Berlien, 27 Mass.App.Ct. 834 (1989) (police officers met the informer at an agreed place; police searched the informer and found him clean of narcotics and money, went with the informer in the informer’s car to target’s home and gave the informer an indeterminate amount of money, and saw the informer enter and then leave the target’s apartment and return to the car. The informer handed police a packet of cocaine and said the target had sold it to him in the apartment. Also, the informer stated that he had seen cocaine and marihuana and a “three beam” scale in the target’s apartment and that he believed the two drugs were now in the apartment.).

 The statement in the affidavit that the Vice Squad was investigating complaints of drug selling at the defendant’s home adds nothing to the calculus because “it is a general averment unrevealing of any source in actual observation.” Commonwealth v. Kaufman, 381 Mass. 301, 304 (1980).

 It is also significant that the affidavits by officer Williams do not state what quantity of cocaine was allegedly sold by the defendant to the Cl. Thus, there is no basis for an inference that the defendant used any portion of the vehicle as a temporary storage or hiding place.

 The mere fact that Sergeant O’Connor observed her hand something to the defendant when she flagged him down in the vicinity of their home on the morning of September 16, 2002, proves nothing.

 There was testimony in this case from Officer Robert Lombardi, a 28-year veteran of the Worcester Police department. On cross examination, he observed that although he wrote a report on September 18, 2002, he made no reference to the stop of Sarah Hebert’s motor vehicle nor the sweeping search that accompanied it, nor the fact that she was placed in custody and transported to 15 Liberty Street because since she was not arrested none of these occurrences was significant enough to constitute “an incident.” This is a remarkably myopic and ill informed view of the constitutional safeguards of Article 14 of the Declaration of Rights and the Fourth Amendment to the United States Constitution. The observations by the Supreme Judicial Court in a different, but related context, are worth noting here:
Roadblocks established for the purpose of interdicting drugs and other contraband essentially give to the police the same powers with respect to individuals in their automobiles as the writs of assistance granted to the British officials with respect to individuals in their homes. Viewed in light of the Commonwealth’s history, it is clear that the Holyoke roadblock is precisely the type of search that the drafters of art. 14 sought to prevent. Drug interdiction roadblocks stop citizens without probable cause or reasonable suspicion to look for evidence of criminal activity (in colonial times, untaxed goods). Such a search is precisely what James Otis and John Adams sought to prevent by art. 14. ‘Those who do not remember the past are condemned to relive it.” G. Santayana, The Life of Reason: 1905-1906.
Commonwealth v. Rodriguez, 430 Mass. 577, 585-86 (2000). See also Commonwealth v. Gonsalves, 429 Mass. 658 (1999) (Ireland, J.) (“I write separately, however, to stress the dangers posed by unfettered police power to order individuals out of automobiles without any justification. The grant of such power is certainly, as the majority notes, a clear invitation to discriminatory enforcement of the rule. This is precisely the type of power that art. 14 was adopted to guard against because, in the words of James Otis, it ‘places the liberty of every man in the hands of every petty officer.’ ”).

 “The toll of substance abuse can be measured in lost lives and dollars spent dealing with its effects. Each year there are more deaths and disabilities from substance abuse than from any other preventable cause. Of 2 million US deaths each year, one in four is attributable to alcohol, illicit drug or tobacco use. The cost of dealing with illicit drugs alone approaches 67 billion annually. Every man, woman and child in America pays nearly $1,000 a year to cover the costs of unnecessary health care, additional law enforcement, auto accidents, crime and lost productivity resulting from substance abuse.” See www.jointogether.org/sa/issues/problem (Join Together is a project of the Boston University School of Public Health that promotes effective strategies to prevent and reduce the incidence of substance abuse and violence).

 There are many ways to measure the extent of the drug problem and a plethora of reports about trends concerning the use of illegal drugs, but one important measure of the problem are the reports gathered from hospital emergency rooms. Consider that the Office of National Drug Control Policy states that reports of cocaine, the most potent, natural stimulant, by hospital emergency rooms, have increased by 47% from 1995 to 2002. See www.whitehousedrugpolicy.gov/drug fact/cocaine/cocaine_b.html. Similarly, between 1995 and 2002, the number of reports of heroin by hospital emergency rooms increased by 34.5%. See www.whitehousedrugpolicy.gov/drug fact/heroin/heroin_b-html.

 The Findings of Fact recited above indicate that the court did not credit significant aspects of the testimony of Sergeant O’Connor, as well as certain testimony by other members of the Worcester Police Vice Squad. This is not the first time this court has reached such a conclusion. See Commonwealth v. Altafracia et al., Worcester Superior Court Criminal No. 2002-1767 at 6-10 (August 29, 2003) (Gants, J.) (rejecting as not credible testimony by Sergeant O’Connor regarding consent to search); Commonwealth v. Colon et al., Worcester Superior Court Criminal Nos. 2003-0206 & 07 at 4-6 (September 8, 2003) (Gants, J.) (rejecting as not credible testimony by Sergeant O’Connor that the police complied with duty to knock and announce before executing a search warrant). For these reasons, the lack of any detail about the credibility of the confidential informant and the reliability of the information it had provided in the past in the affidavits of Officer Lariy T. Williams is a concern. Careful attention to good practices in the use of confidential informants should be of paramount importance to police and prosecutors. See, e.g., Commonwealth, v. Lewin, 405 Mass. 566 (1989) (“Our system tests the existence of probable cause to conduct a search based on information from an unnamed informant by considering the information that a police officer gave under oath to the magistrate who issued the search warrant. The validity of the process depends on belief in the integrity of affiant police officers.”).