**UNITED STATES of America,**

v.

**Earl DESSESAURE, Defendant.**

**No. CRIM.03–10191–NG.**

United States District Court,
D. Massachusetts.

April 13, 2004.

Robert E. Richardson, United States Attorney's Office, Boston, for USA, Plaintiff.

Steven L. Winniman, Winniman & Winniman, Springfield, for Earl Dessesaure (1), Defendant.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

The United States Attorney has chosen to prosecute the defendant, Earl Dessesaure ("Dessesaure"), for an offense that was investigated and prepared entirely by the Boston Police Department, and apparently presented to federal prosecutors after Boston Police had arrested Dessesaure and searched his apartment. While the federal government obviously has a right to bring federal charges in areas in which federal and state authorities have concurrent jurisdiction, and to rely entirely on the professional work of the Boston Police rather than federal law enforcement agencies, in the instant case there were serious problems. For example: The officer, on whom the government principally relied, testified about the observations of certain "confidential sources" to justify the arrest of Dessesaure, but had destroyed any notes of his encounters with them that he had taken before Dessesaure was arrested. Thus, when he represented that these informants were initially "carded" by the Boston Police, and then released from that status ("discarded," if you will), before Dessesaure's arrest, as to one source he had no idea why the status had changed. Was the informant no longer carded because he was not considered reliable? Without notes, how could the officer credibly testify about the information he received ten months before the hearing, especially when he agreed that he had investigated hundreds of cases in between?

And after Dessesaure had been arrested, the officer testified that he and others entered Dessesaure's apartment, to "freeze" the scene, all the while ostensibly waiting for a warrant. "Freezing," according to the officer, did not mean that officers waited at the threshold of the apartment until a warrant was obtained, or detained defendant's girlfriend, to make certain that no one destroyed evidence. Rather, it meant that more than a half-dozen police officers physically entered the Quincy apartment, and looked around (and according to defendant's girlfriend, searched drawers and closets). Instead of passively waiting for a warrant, they used their illegal observations in drafting the search warrant affidavit. The argument that they had a right to freeze the scene in this manner was legally preposterous, and improbably, adopted by government counsel. If courts accepted it, it would make a mockery of the Fourth Amendment.

During the hearing, after the Court expressed concerns about the legality of the "freeze" in the absence of exigent circumstances, the officer testified that Dessesaure had made a statement at his arrest which could be interpreted as asking someone to get rid of the evidence. The statement, "call my peeps!" or "call my people!" was allegedly shouted to someone in the crowd surrounding the defendant. It was not in any police report, not confirmed by the second officer who was on the scene (the testifying officer was not), not argued in the government's papers, and frankly, not credible.

I held an evidentiary hearing over three days on Dessesaure's motion to suppress. The defendant and the government submitted briefs both before and after the hearings. Based only on the evidence that I found credible, and discounting the rest, I conclude that the only search that was valid was the one incident to Dessesaure's arrest; the subsequent search of his Quincy apartment was not valid under any theory. Dessesaure's Motion to Suppress [document # 15] is **GRANTED in part and DENIED in part.**

## II. FINDINGS OF FACT

Dessesaure is charged with (Count I) being a felon in possession of ammunition, (Counts II and III) possession with intent to distribute heroin, and (Count IV) possession of a firearm in furtherance of a drug trafficking crime. The evidence challenged consists of evidence seized by the Boston Police during a post-arrest search of Dessesaure at the police station (finding heroin, money, a cell phone, and a beeper), and a post-arrest search of his Quincy apartment pursuant to a warrant (heroin, narcotics paraphernalia, a gun, and bullets).

### A. The Pre–Stop Investigation

Dessesaure was stopped while driving his vehicle on Massachusetts Avenue in Boston at around noon on February 24, 2003.

Boston Police from the Drug Control Unit ("DCU") began surveillance of defendant early that same morning (at approximately 5:45 a.m.), in response to information "from different sources" that the defendant was selling packaged heroin in the Roxbury, South Boston, and Dorchester areas of Boston.

#### 1. Sources

To justify the warrantless stop and arrest of Dessesaure, Officer Broderick ("Broderick") provided testimony regarding two sources.

##### a. Source One

Source One told Broderick that he knew a black male named "Smooth," whom the source knew to be Earl Dessesaure, and who delivered heroin in half-gram and gram quantities. Source One said Dessesaure lived at 270 Quarry Street in Quincy,

often had flashy jewelry, and drove a maroon Cadillac Escalade with license plate 5887WR, which he used to deliver the heroin, and made arrangements for sales using a beeper and cell phone.[1]

Broderick's testimony was sloppy, inconsistent, and worse, not credible. In response to the Court's question about what he knew concerning Source One's reliability, Broderick noted only that the Source provided him with information on "at least two occasions" that led to "arrests and convictions," and that the Source had dealt directly with the defendant.[2] There were, he noted, perhaps "a half a dozen occasions" when Source One had engaged in such transactions with the defendant. He did not give any specific information about the relationship between Source One and Dessesaure—no times, no dates, no locations. Nor did Broderick offer any indication of how recent or stale Source One's information was. At first Broderick said that Source One told him that he dealt with Dessesaure on "at least a half-dozen different occasions" within the six months prior to the surveillance, then a few questions later he changed his testimony to "perhaps" 60 days before.

The Court interjected again: "Before you came here, did you review your notes?" Broderick answered "the notes I had I did review, yes." "Do you still have those notes?" the Court asked. He answered: "I do not." "What happened to them?" the Court asked. Broderick responded, ". . . the original notes I discarded. But those notes were just essentially what I just testified to." Counsel for the government asked when, relative to the federal charges, had he "discarded" his notes: "well before" he answered.[3] Some-

1. It must be noted that the account of what Source One and Source Two told the officer was nearly identical—vague, no dates, no details.

2. The government did produce the names of three individuals about whom Source One had provided tips which led to the seizure of contraband and convictions years before (1996–1998), although none of that information was reflected on Source One's card or on any documentation supplied by Broderick. In any event, however many convictions the Source had engendered, as described above, at the time of Dessesaure's arrest, he was no longer a "carded" informant—and no one could say why.

3. It is not at all clear whether the United States Attorney's office knew that Broderick had discarded his notes long before federal charges had been brought, but nevertheless decided to proceed with the federal prosecution. Had the case been brought by federal law enforcement officers, or even a joint federal state task force, law enforcement would have been bound by Rule 116.9 of the Local Rules of the United States District Court for the District of Massachusetts, dealing with the "preservation of notes." U.S. Dist. Ct. Rules D. Mass., Rule 116.9 provides:

(A) All contemporaneous notes, memoranda, statements, reports, surveillance logs, tape recordings, and other documents memorializing matters relevant to the charges contained in the indictment made by or in the custody of any law enforcement officer whose agency at the time was formally participating in an investigation intended, in whole or in part, to result in a federal indictment shall be preserved until the entry of judgment unless otherwise ordered by the Court.

(B) These Local Rules do not require the preservation of rough drafts of reports after a subsequent draft of final report is prepared.

(C) These Local Rules do not require modification of a government agency's established procedure for the retention and disposal of documents when the agency does not reasonably anticipate a criminal prosecution.

Since the Boston Police conducted the investigation on their own, and the federal government just embraced it at the end, these obligations arguably do not apply directly. However, whether or not Broderick had to keep the notes by law or rule, the Court can surely consider their destruction, and his testimony with respect to it in evaluating his credibility.

how then, the witness had reviewed notes before he came to Court,[4] ostensibly so as to be able to testify about the Source with even the limited details he gave, but at the same time he had discarded the notes before the February 24 search.

Then the Court asked how many cases Broderick had had in the ten months or so between the time he had apparently discarded his notes, and the time of the suppression hearing, "Oh hundreds" was his response. The Court inquired how, without the aid of notes and given the numbers of cases between the Dessesaure investigation and his testimony, the officer could possibly remember this one. The answer was not responsive.

Even more problematic was Broderick's testimony about the fact that Source One had been a "carded Boston Police informant" between 1996 and 1997. He noted that Source One had been "deactivated" at the time he gave Broderick information regarding Dessesaure. According to Broderick, an informant is "carded" when they are authorized to work as a confidential informant and have signed a working agreement. When that occurs, their photograph and information are taken and put into a file, where the history of their involvement in different cases is recorded.[5]

The government submitted Source One's redacted card, indicating he was "carded" between 1996 and 1997, but nothing in the document indicated why Source One had been deactivated. More importantly, Broderick did not know and suggested that a

source could be deactivated for any number of reasons—ranging from the informant simply choosing not to act in that capacity any longer, to the informant being removed for wrongdoing, such as lying. Broderick could not even testify with any certainty as to *when* Source One had been deactivated, although he estimated it was between six-months to one year *before* Dessesaure's arrest. In fact, according to the redacted card entered into evidence by the government, Source One had been deactivated for more than five years before February 24, 2003—the date of Dessesaure's arrest.

Although Broderick testified he felt "very strongly [Source One's control officer] would not have referred" Source One to him if he had been deactivated for lying, that was small comfort to the Court. Broderick knew little to nothing about Source One's history, and could document even less. The one thing he was apparently sure of was that Source One was not paid for the information regarding the defendant, but he could not remember what reason Source One had for giving him the information relevant to this case.[6]

### b. *Source Two*

Source Two gave Broderick information that was nearly identical to Source One and similarly vague: He knew Dessesaure as "Smooth," and that he drove a maroon Escalade. He also provided Dessesaure's license plate information, and that Dessesaure was selling heroin to people in the

**4.** It is possible that Broderick is referring here to two sets of notes—one during the course of the investigation, pre-search, and a second set of notes he used to prepare his testimony. Either way—none were produced; none were preserved.

**5.** Documenting informants is particularly important as a way of avoiding abuse. *See, e.g.* *Commonwealth v. Lewin,* 405 Mass. 566, 542 N.E.2d 275 (1989) (police officer cited to an

informant in a search warrant affidavit who did not exist). *See also,* Tony Locy, *Bungled Raid Raises Questions on Reliability of Police Informants,* Boston Globe, March 27, 1994.

**6.** Broderick did not know whether Source One had been a paid informant, a defendant informant, or both when he provided the information which led to the arrests and convictions referenced in Note 2, *supra.*

Dudley triangle and Lennox Street area. Broderick did somewhat better on the question of whether Source Two's information was stale. He estimated—because that is all he could do—that Source Two had provided him with the information 30 days prior to February 24.

However, as with Source One, Broderick testified that Source Two told him he had purchased heroin "on occasions" from Dessesaure, but could give literally no details of their encounters or verify that they had actually taken place.

Source Two had been a carded informant in the past, and, like Source One, had been deactivated at the time he gave the information relating to the defendant, but had since been reactivated. Here, Broderick at least knew—or claimed to know—the reason for the deactivation. Source Two had been deactivated for "dropping out of touch," information not reflected on Source Two's card. Broderick testified that Source Two had been a paid informant in the past (but was not paid for the information relating to Dessesaure) and had provided other officers with information that had led to seizures of narcotics and individuals "on at least two different occasions," but could not be more specific.[7]

Again, Broderick had no notes, no documentation, no corroboration. And yet again, the only thing Broderick corroborated was that a maroon Escalade with the license plate number provided by both sources was registered to Dessesaure at the 270 Quarry Street address.

### 2. *Surveillance*

According to the government, the DCU's surveillance of Dessesaure began at approximately 5:45 a.m. on February 24, 2003, when officers from the Boston Police drug unit began monitoring 270 Quarry Street. Significantly, other officers besides Broderick were involved in this surveillance.

At 9:00 a.m., Officer Paul Quinn ("Quinn") observed Dessesaure come out of the back door of 270 Quarry Street and throw a garbage bag in a dumpster. Quinn retrieved the garbage bag and, among other things, found a cellular phone bill with the name of Earl Dessesaure, a plastic bag that had a white residue inside it which he "believed" was consistent with heroin, and a plastic bag that had been tied up and cut off.

Significantly, however, neither Quinn nor any other officer did a field test to determine whether the white residue was in fact heroin, although Broderick testified that the officers have the ability to conduct such a test. The failure to test the bag is striking given that there were a significant number of officers involved in the day's surveillance of Dessesaure and the surveillance took several hours—a finding that the white residue was in fact heroin would have provided officers with support for a search of Dessesaure's apartment, something which they did not have based on the two sources, who mentioned only Dessesaure's car and dealings within it.[8]

Officers followed Dessesaure as he drove in the maroon Escalade into the City of Boston, where he stopped at 48 Ridgewood Street in Dorchester. At 48 Ridgewood Street, Dessesaure grabbed a black shoulder bag from the back seat, and entered the residence. He exited the residence and returned to the Escalade ap-

---

7. The government again provided the names of three individuals about whom Source Two had given information which led to the seizure of contraband and convictions, but this information was nowhere documented by Broderick, and was not on the "card."

8. Indeed, in the search warrant affidavit Broderick does not even speculate about what the substance might be. He calls it "residue of an unknown powder substance."

proximately two minutes later. One minute later, a female (later identified as his girlfriend—Tina Tate) exited the residence and also entered the Escalade. Significantly, Broderick testified that police had no information Tate was involved in the sale of heroin or any other illegal activity, and they did not believe her to be involved in drug trafficking. For all they knew, Dessesaure picked up his girlfriend to drive her to an errand. In fact, officers continued to follow Dessesaure—now with Tate—as they stopped at Brigham and Woman's Hospital, where Tate went into the hospital for approximately ten minutes and then came out and reentered defendant's car.

The surveillance continued into Dorchester, from where, after losing surveillance for a time, at 11:15 a.m. officers followed the pair back to 270 Quarry Street in Quincy, Dessesaure's apartment. Broderick testified that during this trip (defendant took Route 93 and exited in Quincy) Dessesaure did not take the most direct route, but rather made repeated turns—behavior Broderick believed to be consistent with drug trafficking. The testimony made no sense; Dessesaure was presumably returning to his own home after he picked up his girlfriend to take her to Brigham and Woman's Hospital.

Once at 270 Quarry Street, Dessesaure and Tate entered the apartment. Approximately twenty minutes later, Dessesaure came out by himself, and reentered the Escalade.

Officers then followed Dessesaure back into Boston, this time to the South End. On Huntington Avenue, in front of the Back Bay MBTA station (near the intersection with Dartmouth St.), Dessesaure pulled over, and a Black male (later identified as Nelson Boyd ("Boyd")) entered the Escalade. Dessesaure and Boyd drove West on Huntington Avenue, driving 20–30 miles per hour and having a conversation,

according to Officer Seoane ("Seoane"). Seoane testified he could not see the men exchange anything as they drove. After driving a few blocks to the corner of Massachusetts Ave. and Huntington Ave., Boyd exited the Escalade and began walking North on Massachusetts Ave.

Dessesaure drove South, and began driving "erratically" and at a "high rate of speed," according to Seoane. Seoane testified the erratic driving was, in his experience, the way people usually drive after conducting a drug sale to make sure they are not being followed, although he only described Dessesaure as "cutting cars off, [and] going at a high rate of speed through traffic."

While some DCU officers continued to follow Dessesaure's Escalade, others (including Broderick) stopped Boyd. Boyd lied about ever having been in the Escalade. He told the officers that he had walked from the Back Bay MBTA station. The officers searched him and recovered a half-gram plastic bag of heroin. While Seoane testified that Boyd did not appear to be carrying anything when he entered the Escalade, the bag was small and would not necessarily have been apparent to the surveilling officers.

### B. *The Stop*

Having relayed the information that heroin was found on Boyd, the officers following Dessesaure had a marked police car stop the defendant and Dessesaure was placed under arrest. Seoane made clear that when he stopped Dessesaure, he had already decided to arrest him. A pat-frisk of Dessesaure and a search of the car during his arrest revealed no contraband.

However, Seoane testified that as he approached the driver's side door of the Escalade, he could see that Dessesaure's zipper was open and his shirt was protruding from his zipper. According to Seoane,

in his experience it is common for people in the possession of drugs to attempt to hide them in their rectum to avoid police detection.

Broderick (who was with Boyd, not Dessesaure at this time) testified that Seoane later told him Dessesaure had yelled "call my peeps!" or words to that effect, to "somebody standing on the street" where the arrest took place. It was this statement that, according to Broderick, provided the justification for the "freeze" of the apartment. Broderick testified that the officers felt it necessary to "freeze" the apartment prior to obtaining a warrant because "[w]e were afraid—we had strong belief that the girlfriend was still in the apartment, that this person, that somebody would have a way of contacting that person and essentially destroy any evidence that was at 270 Quarry St."

Broderick presented this critical testimony—which appeared nowhere in his police report or warrant affidavit, nowhere in the government's papers before the hearing—only after the Court made it clear that the officers' concept of a "freeze"—a warrantless search with officers inside the premises—is illegal under the Fourth Amendment in the absence of exigent circumstances.[9] (As I noted above, Broderick's misperception is exceeded perhaps only by the government that took the same position in its initial filings. *See* Government Opposition to Motion to Suppress [document # 25].) Significantly, Seoane, who unlike Broderick was actually present when Dessesaure was arrested and the statement was supposedly made, testified only that the defendant "requested very loudly to make a phone call," a statement made to the officer and not the crowd.[10]

The conclusion is unavoidable that Broderick fabricated the alleged statement when he knew the warrantless entry was being challenged and he needed to come up with some exigency to justify it.

## C. The Search of Dessesaure in the Station House

The government alleges that when defendant was brought to the police station and at the booking desk, Seoane followed up on what he had earlier observed—that defendant's fly was open and his shirt had been partially pulled through the zipper area. Seoane testified that he took Dessesaure to a confined place in order to conduct a strip search, during which time defendant voluntarily "reached into his rectum" and surrendered a plastic bag containing five plastic bags approximately one-half-gram in size and another plastic bag approximately one full gram in size. All bags contained a powder believed to be heroin. Seoane also recovered $7 from defendant's right pants pocket, and $60 from his shirt pocket.

Seoane testified that Dessesaure later told him he was selling the bags of heroin

---

9. The officers' "freeze" concept is discussed in greater detail below.

10. Seoane did note that a crowd had gathered on the sidewalk near the arrest scene and that it was a "high area of heroin buyers and heroin users," but did not contend that there was a particular individual with whom Dessesaure was attempting to communicate. In fact, Seoane did not testify that defendant made the comment to anyone other than Seoane himself.

To be sure, Seoane also embellished his testimony. While Seoane's police report stated only, "Mr. Dessesaure told officers that he needed to make a phone call and he didn't understand why he was being arrested at this time," in Court Seoane added that it had been "very loudly," and that there had been people within earshot he might have known. While Seoane's testimony was not as blatant an attempt to create exigency as Broderick's, the addition ten months later of important details absent from the police report created on the day of the arrest was again notable.

for $60.00. This statement was not recorded in any police document.

## D. The Statements Allegedly Made to Broderick Post–Arrest

According to Broderick, Dessesaure waived his Miranda rights and made a number of statements to them regarding the existence of heroin at his apartment at 270 Quarry Street, including specific amounts and locations within the apartment. Dessesaure denied that such statements were made.

As discussed above, Broderick was simply not a credible witness. What is more, his story regarding Dessesaure's alleged station house statements simply does not make sense.

According to the Broderick, Dessesaure gave him all of this information because they told him they were already going to "freeze" his apartment, they knew his girlfriend was there and they would charge her for everything in the apartment, but would be lenient with her if he willingly gave them information. Broderick, however, had earlier testified that the police never believed Dessesaure's girlfriend to be involved at all in drug trafficking.[11]

After Broderick threatened to arrest and charge defendant's girlfriend, Dessesaure became very cooperative and began giving him details about the quantity and location of drugs in the apartment. Bro-

derick claimed Dessesaure was not giving him this information reluctantly—quite the opposite, he was eager to resolve the situation in a way that would keep his girlfriend out of trouble.

Broderick, however, offers no explanation for why Dessesaure's statements were not recorded in any way; written, video, or audio. Dessesaure was not asked to sign a statement that reduced his so-called admission to writing. Nor does Broderick offer any explanation for why no officer had him sign a Miranda waiver.[12]

Taking into account his entire testimony, I give no credit to Broderick's claims that defendant made statements about drugs in his apartment.[13]

## E. The Preliminary Apartment Search—the "Freeze"

Taking keys for the Quincy apartment from Dessesaure, Boston and Quincy Police Officers proceeded to defendant's apartment at 270 Quarry Street for the stated purpose of "freezing" it. Using defendant's keys, they opened the door to the apartment and announced "Boston Police." They had no warrant.

At least six to ten officers[14] were actually inside the apartment—not on the threshold. Once there, the officers observed Tate, who had been in the car with

---

11. If Broderick made the statement to the defendant, it would have been a misrepresentation, surely casting a cloud over any argument that the statements were voluntarily given. See Note 20 infra.

12. Seoane actually testified that Dessesaure did sign a Miranda waiver, but none was produced by the government, and no explanation given for why a signed waiver form would not have been produced. The inevitable conclusion is that it simply never existed.

13. Because Broderick conveniently did not submit his warrant affidavit until after having been part of the group of officers who "froze" the apartment, there is no way to tell definitively whether Broderick knew the facts in that affidavit from Dessesaure, or from his own illegal observations inside 270 Quarry Street.

14. Broderick testified there were between six and ten officers, although he could not remember exactly how many. Tate testified there were between 10 and 15.

Dessesaure. They did not simply take Tate—the only person in the apartment—outside and wait for a warrant, although obviously that is all that would have been necessary to avoid any potential destruction of evidence.[15] Instead, they continued to make observations, observations that were then included in the warrant.

Allegedly during a "protective sweep" and in plain view, Broderick testified they saw 16 "bundles" of glassine bags, five loose glassine bags, a large plastic bag containing a powder they believed to be heroin, and a variety of drug paraphernalia.[16] According to Broderick, Tate stated that the stuff on the table was her boyfriend's, and the officers observed numerous photographs of Dessesaure around the apartment.

Broderick, who was one of the officers at the apartment, claims he then called Seoane at the station and told him what they found. Seoane then asked Dessesaure about the drugs that had been in the apartment and Dessesaure allegedly gave more specific information about the location and description of the drugs. I do not find Seoane's account of Dessesaure's statements credible.[17] In any event, if the first search were illegal as I find it to be, confronting the defendant with the fruits of an illegal search arguably taints any subsequent statements made.

## F. *The Warrant and Second Search of the Apartment*

After making observations within the apartment, Broderick left and went to the Norfolk County District Attorney's Office in Quincy, where he began to prepare an application for a search warrant. Broderick's affidavit in support of the search warrant included 1) information he had received from the sources prior to February 24, 2) observations he made inside the 270 Quarry St. apartment, as well as 3) a description of the surveillance,[18] 4) the stop, 5) the search of Dessesaure in the station house, and 6) the alleged statements regarding drugs in the apartment. However, Broderick made no mention of the fact that both sources had been deactivated, or that the information from the sources was months old.

Officer McNeil of the Quincy Police Department also filed an affidavit in support of an application for a search warrant for defendant's apartment. McNeil's affidavit offered no new information—it consisted of generalities about how drug distribution networks "typically" operate, and a summary of what Broderick had told him about the investigation of Dessesaure. That search warrant was granted, and the police seized further property from the apartment: the gun, bullets, more heroin and drug paraphernalia, money, and assorted documents.

**15.** This fact is significant only in that it bears on the credibility of Broderick's claim that the officers entered the apartment without a warrant only to secure it, and not to search for evidence.

**16.** There is some dispute as to exactly what the police did inside the apartment—Tate testified the officers went through cabinets, drawers, and the trash; the government described a more perfunctory "sweep." As is discussed below, if the police had no right to enter the apartment and make observations at all, and they admit to doing that, whether

they also opened cabinets and drawers is immaterial.

**17.** In any event, if the first search were illegal, as I find it to be, confronting the defendant with the fruits of an illegal search could, depending on the circumstances, taint any subsequent statements made. *See e.g. United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

**18.** The search warrant affidavit *did not* state that the powder substance was believed to be heroin.

## III. CONCLUSIONS OF LAW

### A. Evidence From Dessesaure's Person

#### 1. The Arrest

■ Dessesaure argues the police lacked probable cause to arrest him. It is a close case, filled with less than credible statements by Officer Broderick. Nevertheless, looking solely at the observations made by officers other than Broderick I find there was sufficient probable cause to arrest Dessesaure.

Police have probable cause to make a warrantless arrest when they have knowledge of facts and circumstances sufficient to warrant a belief by a prudent person that an offense has been committed by the person to be arrested. See Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (warrantless arrest permissible when probable cause exists to believe defendant has committed a felony).

I give very little credit to Broderick's account of his sources, given his lack of credibility. However, I do credit the observations made by others during the surveillance—that Dessesaure was driving evasively before and after his interaction with Boyd, the fact that Boyd lied about having been in Dessesaure's car, and most significantly, the heroin found on Boyd upon exiting Dessesaure's Escalade after driving with him for only a few blocks. These facts create a set of inferences just enough to constitute probable cause to believe Dessesaure was the source of Boyd's heroin, and to justify defendant's arrest.

Significantly, however, the existence of probable cause at this point related only to Dessesaure's person and his car.

#### 2. The Search of Dessesaure in the Station House

■ Having found that the police had probable cause to arrest the defendant, I also find that the police were justified in conducting a search incident to arrest at the station that led to the discovery of six small bags of heroin, $67, a cell phone, and a beeper. See e.g. United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); Michigan v. DeFillippo, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

Again, however, the right to search Dessesaure extended at this point only to his person and his car.

### B. Evidence From Dessesaure's Apartment

The search of Dessesaure's apartment is another matter. It is undisputed that officers entered and searched defendant's apartment prior to receiving a search warrant. It is also undisputed that information obtained during that illegal entry was used in obtaining the warrant.

#### 1. Exigency

Putting aside for a moment the question of whether probable cause existed for the officers to search defendant's apartment at all, the government asserts that the officers' "freeze" of the apartment was justified because exigent circumstances existed based on a statement "call my peeps!" Dessesaure supposedly made to the crowd.

It is, of course, true that a warrantless entry into a person's home is justified when exigent circumstances exist. See e.g., United States v. Moore, 790 F.2d 13, 15 (1st Cir.1990); United States v. Edwards, 602 F.2d 458, 467–69 (1st Cir.1979).

But, I do not find Broderick's testimony in this regard to have been even slightly credible. As such, there were no exigent circumstances that would excuse the officers' warrantless entry into and search of defendant's apartment.

## 2. *Absent Exigent Circumstances, "Freezing" an Apartment by Entering it Without a Warrant Violates the Fourth Amendment*

■ There is no question that the police had no right to "freeze" the Quincy apartment where that meant entering it, looking around, searching, all the while ostensibly waiting for someone to get a warrant. Nothing in First Circuit or Supreme Court case law remotely justifies such a step. Nor should it. Searching without a warrant, on the assumption that the magistrate will no doubt agree with the officers that there is probable cause to search that location at that time, makes a mockery of Fourth Amendment protection. The warrant, and the review it requires, is reduced to a technicality.

All of the cases dealing with this issue focus on the question of remedy—what a court is to do with evidence obtained after the search pursuant to a warrant, how far does the exclusionary rule go. None does what the government tries to do here— namely, claim the officers' conduct in searching before they had the warrant in hand was correct, lawful or constitutional.

In *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), there was no question that officers illegally entered private premises, and remained there while a warrant was obtained. And there, the officers arguably did nothing but wait. They did not search, or make observations that then became part of the affidavit. The only question was whether the Court should suppress evidence subsequently discovered at those premises when

executing a search warrant (not evidence that they had observed while waiting for the warrant) obtained on the basis of information wholly unconnected with the illegal entry. The Court concluded that evidence pursuant to the warrant had been obtained through an "independent source." [19]

In *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), the Court dealt with a related question—where the officers initially observed criminal evidence during an illegal entry, and then seized the same evidence during a search pursuant to a warrant. Federal officers entered a warehouse, after surveilling the defendant driving a tractor trailer rig out of it, found to contain marijuana. They saw bales of marijuana in plain view, left and prepared a search warrant neither mentioning the prior illegal entry nor the observations during it. When they returned, they seized the same bales they had observed. Again, there was no question that the first search was illegal. Nor was there any question that the search warrant affidavit, which did not refer to any tainted sources, established probable cause. The only question was:

> whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magis-

---

**19.** The "independent source" rule was intended to put the police "in the same, not a worse, position than they would have been if no police error or misconduct had occurred." *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Thus, the Court concluded that "[w]hen the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in the absence of any error or violation." "Inevitable discovery" is a related concept, assuming that the evidence initially obtained illegally would have been obtained through "independent" and lawful sources. *Murray v. United States,* 487 U.S. 533, 549, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

trate and affected his decision to issue the warrant.

487 U.S. at 542, 108 S.Ct. 2529.

Put otherwise, would the officers have bothered getting a warrant if they had come up with nothing on their initial illegal entry? If they would not have, if they were simply searching first to determine whether the warrant was worth their while, the fruits of the warrant search would be suppressed. The Court remanded the case to the district court to make this determination.[20]

Since there is absolutely no question that the Boston Police officers here had no right to enter Dessesaure's apartment, and search it, all the while waiting for a warrant, and no question that the search warrant affidavit reflected tainted observations, the only issue is remedy—what flows from the illegal search.

### 3. *The Search Pursuant to a Warrant*

■ The standard for reviewing whether an affidavit provides sufficient support to justify the issuance of a search warrant is as follows:

In determining the sufficiency of an affidavit, we consider whether the totality of the circumstances stated in the affidavit demonstrates probable cause to search the premises. We examine the affidavit in a practical, common-sense fashion and accord considerable defer-ence to reasonable inferences the issuing justice may have drawn from the attested facts. Under the probable cause standard, the totality of the circumstances disclosed in the supporting affidavits must demonstrate a fair probability that contraband or evidence of a crime will be found in a particular place. In a doubtful or marginal case, the court defers to the issuing magistrate's determination of probable cause.

*United States v. Barnard,* 299 F.3d 90, 93 (1st Cir.2002) (citations and internal punctuation omitted).

As written, the affidavits submitted in support of the Quincy apartment search would establish probable cause if the observations taken within 270 Quarry Street of drugs, etc., before the search warrant was obtained, and Dessesaure's alleged station house comments, were included. But neither pieces of evidence should be considered. First, as noted above, the search that led to the apartment observations was blatantly unlawful. Any observations derived from it that found their way into the search warrant affidavit may not be considered.

Second, the statements allegedly attributed to Dessesaure at the station house must also be excised. I conclude that Broderick's testimony in this regard is not credible, that they were material misrepresentations under the authority of *Franks v. Delaware,* 438 U.S. 154, 172, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)[21] and cannot

---

**20.** Likewise, in *United States v. Silvestri,* 787 F.2d 736 (1st Cir.1986), decided after *Segura* and before *Murray,* the Court agreed that the police officers had unlawfully searched a residence and discovered large quantities of drugs in the garage. Two other officers, who were not involved in the unlawful search, prepared the search warrant affidavit and application without any knowledge of the illegal search. They found the same drugs. Asking whether the legal means were "truly independent" of the illegal, and the discovery of the contraband truly "inevitable, the Court declined to suppress the evidence." While the Court did not ask the question the Supreme Court asked in *Murray*—would the officers have sought a search warrant if the illegal search had come up empty—the findings arguably cover that contingency.

**21.** Even if I did believe Dessesaure had made the statements, I would have significant concerns regarding their voluntariness. Broderick testified that the police never believed Tate was at all involved with illegal activity, yet he threatened to arrest her and charge her if Dessesaure did not cooperate. I do not believe statements made under those circumstances would be voluntary. *See United States v. Finch,* 998 F.2d 349, 356 (6th Cir.1993)

be considered.[22]

What remains in the affidavit are the following facts: vague information from sources without any description of their basis of knowledge, observations of Dessesaure's interaction with Boyd and his erratic driving afterwards, and the heroin recovered from Boyd and Dessesaure. Those facts simply do not suffice to create probable cause to conclude that Dessesaure kept drugs in his apartment, or anywhere else besides his car.[23]

Indeed, the government's theory (as well as the information from its sources and observations) was that the defendant's practice was to deal drugs out of his car. They had no information—apart from the incredible statements and tainted observations, that linked Dessesaure's drug dealing to a particular address to obtain a warrant to search that address. *See United States v. Modlin et al.*, No. 01–cr–10314–MLW, slip op. at 8 (D.Mass. January 6, 2003) citing *generally* 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.7(d) (1996 & Supp.2003) (collecting cases).

## IV. *CONCLUSION*

Officer Broderick's behavior in this case demonstrates not only a misunderstanding of and a disrespect for Fourth Amendment law and the rights of citizens to be free from unreasonable searches and seizures, but a willingness to provide testimony before this Court that was less than credible. The only reason that any portion of these charges stand is because the observations of other officers support Dessesaure's arrest and the contraband recovered from his person.

Without the tainted or the contrived information, there was no basis to search Dessesaure's house—no "independent source" for the search warrant affidavit, no "inevitable discovery" of its contents. Indeed, from the record I can conclude with confidence that if the officers had come up empty-handed during the Quincy apartment freeze, they would never have bothered to go any further.

In fact, the only issue is the one with which this decision began—why did the government bring this case given the obvious problems with the search and the record keeping—but that issue is beyond the jurisdiction of this Court.

Accordingly, Dessesaure's Motion to Suppress the evidence recovered from his

(citing *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (statements not voluntary where defendant's wife had nothing to do with the crime and suffered from arthritis—officer told him he would be "less than a man" if he allowed her to be brought in); *Lynumn v. Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (threats to a defendant mother, unsophisticated in criminal law, that state financial aid to her infant children would be cut off and her children taken away from her if she failed to cooperate rendered her confession involuntary)). *See* Note 11 *supra.*

**22.** Under *Franks,* I am required to eliminate from any consideration of the warrant affidavit allegations which I find to be "the result of carelessness or reckless disregard of the truth," and to void the warrant and exclude the fruits of the search if the remaining content is insufficient to establish probable cause. *Id.*

**23.** As stated above, the warrant affidavit did not even include a specific suggestion that the police found evidence of heroin in the plastic bag Dessesaure threw on top of the dumpster. The affidavit referenced a "plastic bag containing residue of an unknown powder substance, one plastic bag that had been tied up and cut off," but did not report that the police believed the powder substance to be heroin, or even that it was white. My substantial concerns about the fact that police failed to run a test on the substance thus need not even figure into the analysis here.

person is **DENIED,** and evidence recovered from his apartment is **GRANTED.**

**SO ORDERED.**